FRANK J. SAIA and GRACE P. SAIA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SAIA v. COMMISSIONER
Docket No. 301-73
United States Tax Court
T.C. Memo 1974-301; 1974 Tax Ct. Memo LEXIS 16; 33 T.C.M. (CCH) 1391; T.C.M. (RIA) 740301; December 4, 1974, Filed. *16 Petitioner loaned money to a corporation and an individual and secured a note for two individuals. In each case petitioner claimed his purpose was to gain additional work for the corporation that he controlled. In 1970 petitioner claimed these loans became worthless and deducted his losses on his personal tax return. Held: Petitioner's loans are characterized as nonbusiness bad debts. United States v. Generes, 405 U.S. 93 (1972). Held further: Petitioner does not qualify under section 166(f) since the borrowers used the money for investment purposes which was not their trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963). Held further: None of these loans became worthless in 1970. Petitioner also deducted a "compensation for services" expense on his personal tax return. Held: Petitioner has not shown that this expense arose in connection with his trade or business or that it was for services actually rendered. Theodore L. Jones, for the petitioners. Paul H. Waldman, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined a deficiency in petitioners' federal income tax for the taxable year 1970 in the amount *17 of $67,625.49. This deficiency resulted from respondent's disallowance of three business bad debts and a "compensation for services" expense claimed by petitioners as employee business expenses on their individual tax return for 1970. Respondent determined that these debts were nonbusiness debts subject to the provisions of section 166(d) and the corresponding limitations of section 1211 of the Internal Revenue Code of 1954. [1] In addition respondent determined that petitioners had not established that two of the debts had become worthless in the taxable year in issue. The "compensation for services" expense was disallowed by reason of petitioners' failure to establish that it constituted an ordinary and necessary business expense within the meaning of section 162. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference. Petitioners, Frank J. Saia (hereinafter petitioner) and Grace P. Saia are husband and wife who resided at 8585 Airline Highway, Baton Rouge, Louisiana at the *18 time of filing their petition herein. Petitioners filed a joint federal individual income tax return for the calendar year 1970. Petitioner was the president and major shareholder of Saia Electric, Inc. (hereinafter Saia Electric) a corporation engaged in the electrical construction and contracting business. Petitioner, among other duties, was responsible for soliciting business on behalf of the corporation. Petitioner, on his own behalf, made numerous investments in corporate and government securities. These investments were made nominally by Saia Investments, [2] but were reflected on petitioners' personal financial statements. Dividends and interest on these investments were reported on petitioners' tax returns. On their 1970 federal tax return, petitioners claimed as a deduction from gross income $83,207.85 of bad debt employee business expenses. This figure is comprised of 3 separate transactions as follows: Ty-Mac, Inc.
$63,107.85
Capital City Communications, Inc.
20,000.00
Arthur Matthews
100.00
$83,207.85 Petitioner first became interested in Ty-Mac, Inc. (hereinafter Ty-Mac) a *19 Las Vegas, Nevada based corporation engaged in the electrical outdoor sign business in 1968. After investigating its operations, petitioner advanced $68,500 to Ty-Mac of which $65,980 was in the form of a loan. The remaining $2,520 was for a 32 percent capital stock interest. The source of these funds came from 4 separate loans made by petitioner between October 15 and December 9, 1968. These loans were evidenced by notes executed individually by petitioner on behalf of Saia Investments. To evidence a portion of the loan to Ty-Mac petitioner received a promissory note in the amount of $52,480 on October 9, 1968. The note was signed by Alton C. Bingham (hereinafter Bingham), the secretary-treasurer of Ty-Mac. To insure payment of the note, petitioner was assigned Ty-Mac's right to receive monthly payments due it on 6 contracts with one of its customers. Payments on the note were made through October 21, 1969. This creditor and equity interest in Ty-Mac was reflected on petitioners' personal financial statement prepared as of August 31, 1969. Petitioner remained actively concerned in Ty-Mac's affairs after the initial investment. Toward this end petitioner retained a Las Vegas, *20 Nevada law firm to investigate Ty-Mac's affairs. In January, 1970, a few months after the payments on the notes had stopped, petitioner received a report from the law firm. The firm found Ty-Mac's officers to be untrustworthy and possibly engaging in improper conduct. It also concluded that Ty-Mac did not have much chance to succeed. Based on its investigation the firm recommended that either Ty-Mac's assets be sold or a law suit be instituted against the officers. Petitioner received another report from the firm in July, 1970. A sale of Ty-Mac's assets to a third party for $35,000 was proposed. It suggested that the sale proceeds be held in escrow for petitioner's benefit and that prospective legal actions be waived. The firm thought this would be the quickest and most economical way to settle this matter. The other alternative would be to initiate legal action securing the appointment of a receiver, getting court orders for the sale, and determinations of liability for mismanagement. Ty-Mac's balance sheet as of October 31, 1970, reflected the following figures: ASSETS
Current Assets
Cash in Bank
$ 5,326.43
Deposits
300.00
Total Current Assets
$ 5,626.43
Fixed Assets
Signs and Equipment
$54,340.29
Less: Accumulated Depreciation
12,817.82
$41,522.47
Total Assets
47,148.90
LIABILITIES AND STOCK HOLDERS EQUITY
Liabilities Loans and Notes payable - Stockholders
$61,512.01
Stockholders Equity
Capital Stock Issued and Outstanding
12,020.00
Retained earnings October 31, 1969
(23,398.90)
Income for Year Ended October 31, 1970
( 2,984.21)
(14,363.11)
Total Liabilities and Stockholders Equity
$47,148.90
*21 Petitioner received another report from the firm in December, 1970. At this point a second prospective buyer was interested in Ty-Mac's assets. It suggested that a board of directors meeting be convened in early January, 1971 to consider the sale possibilities. The prospective sales price was approximately $40,000. In April, 1971 there was another flurry of correspondence concerning the sale of Ty-Mac's assets, but this attempt like the others did not materialize. In July, 1971 Ty-Mac's secretary-treasurer, now Raymond Marino, tendered his letter of resignation. In this letter Marino stated that funds were now exhausted and operating expenses could not be met. He also cited petitioner's lack of cooperation to facilitate a possible sale. Ty-Mac continued to receive payments from its customers and at least through July, 1971 it was making check disbursements. In June, 1971 petitioner instituted a suit, in the United States District Court, to collect two notes given to petitioner by Ty-Mac. [3] The complaint alleged that payments on the 1968 promissory note had stopped in October, 1969 and that now $29,632.09 and $4,446.07 of principal and interest, respectively, were outstanding. *22 [4] The complaint further alleged that no part of the 1971 promissory note had been paid and that it was now due. Judgment was entered in petitioner's favor in August, 1971. In April, 1972 petitioner entered into an agreement of sale of all his interests in Ty-Mac to Bingham for $3,000 and a promissory installment note for $22,000. This installment note was valued at $14,666.67 in petitioners' personal financial statement prepared as of June 30, 1972. Also in April, 1972 petitioner received $2,915 in partial payment of his debt and equity interest in Ty-Mac. Capital City Communications, Inc. (hereinafter Capital City) was a corporation that owned and operated radio station WLUX in Baton Rouge, Louisiana. During 1969 the corporation was experiencing difficulties. There were disagreements among the shareholders and substantial debts. During this period Robert Watson (hereinafter *23 Watson) and William Carrigan (hereinafter Carrigan) were employed at WLUX. Watson served as president and Carrigan was the program director and announcer. Both men were shareholders in Capital City. Petitioner was acquainted with both Watson and Carrigan. Through this acquaintance petitioner became aware of their problems. After a discussion with Watson and Carrigan, petitioner agreed to help them borrow $20,000 from a bank to buy out the disgruntled stockholders. The loan was evidenced by a note signed by petitioner, Watson and Carrigan in November, 1969. The money was used by Watson and Carrigan to get three cashier's checks payable to the stockholders whose stock was to be purchased. The purchase was then made. However not all of the purchased shares were formally transferred to Watson and Carrigan. In November, 1969 the note was renewed and a new 30 day note was executed in March, 1970. This note was signed by Watson as president of Capital City and endorsed individually by Watson and Carrigan and secured by petitioner. [5] When the renewal note became due in April, 1970 *24 Capital City did not pay the note on demand. Shortly thereafter petitioner sued both Watson and Carrigan for the $20,000. [6] However, the law suit was dropped with prejudice before a judgment was obtained. In consideration for dropping the suit Watson and Carrigan signed quit claim deeds relinquishing to petitioner all rights they had in Capital City stock standing in their names and in the names of the stockholders whose stock had been previously purchased. Carrigan also received a check for $4,000. At that time the worth of the Capital City stock was impaired by several large outstanding debts. The stock in Capital City was ultimately transferred to C. Verne Brian, petitioner's son-in-law in November, 1970. During 1970 both Watson and Carrigan were in poor financial condition, however neither man has ever declared bankruptcy. Watson had some judgments outstanding, some of which remained unpaid at trial date. As president of Saia Electric one of petitioner's responsibilities *25 was to solicit business. In that connection he had dealings with Arthur Matthews (hereinafter Matthews) an assistant for one of Saia Electric's clients. On several occasions Matthews received money from petitioner. On one occasion the loan was made in the form of a check for $100. Saia Electric did secure electrical contracting work from Matthew's employer. Petitioner has made no serious effort to collect this money, and at the time of trial Matthews was still working for the same employer. Petitioners on their 1970 tax return, claimed a "compensation for services" expense deduction in the amount of $11,043.69 as an employee business expense. Petitioner had occasion to endorse a note of $10,000 for O. C. Smith (hereinafter Smith).Smith and his family (hereinafter Smith heirs) were close personal friends of petitioner. Petitioner had on other occasions advanced funds to Smith under verbal agreements. Smith was also a business associate of petitioner. They had many discussions regarding the affairs of Saia Electric. Smith died in May, 1970 still owing the $10,000 note. Petitioner ultimately paid the note. [7] *26 Smith died in possession of an undivided one-half interest of 300 shares in the O.K.C. Corporation (hereinafter O.K.C.). This stock passed to the Smith heirs. In March, 1971 petitioner and the Smith heirs (including Smith's widow who owned the other one-half interest in the stock) entered into an agreement. The agreement recited the facts that Smith died with the $10,000 note outstanding and holding the 300 shares in O.K.C. The Smith heirs agreed to assign their rights to the stock to petitioner, and the parties agreed to enter into an agreement regarding the distribution of proceeds from any sale of the stock. It was petitioner's intention to be repaid from the sale proceeds with any additional proceeds going to the Smith heirs. In March, 1971, the Smith heirs (including Smith's widow) formally assigned their rights in the stock to petitioner and authorized the corporation to transfer the stock to petitioner's name. In January, 1971 the value of the 300 shares was $7,650 and by March, 1971 it had risen to $8,850. Petitioner did not make any serious efforts to recoup the difference between *27 the amount of the note and the value of the stock. Respondent disallowed the Ty-Mac and Capital City deductions as follows: The amount * * * claimed as a business bad debt * * * is not allowable because it has not been established that it was a business bad debt which became worthless in the taxable year. If, however, it should be established that it did become worthless in the taxable year, it is determined that the debt was a nonbusiness bad debt, since the debt was a personal loan and not created in connection with your trade or business. Respondent disallowed the Matthews deduction as follows: * * * it is determined that the debt was a nonbusiness bad debt, since the debt was a personal loan and not created in connection with your trade or business. Respondent disallowed the compensation for services deduction as follows: The amount * * * claimed for compensation for services is not allowed because it has not been established that any amount constitutes an ordinary and necessary business expense or was expended for the purpose designated. With respect to the latter determination, petitioners' petition only alleges that the payment to Smith was for compensation and therefore *28 should be deductible. OPINION The case at bar requires our determination of several issues of whether certain expenses incurred by the petitioner are properly deductible within the terms of sections 62(1), 162 and 166. [8] *29 *30 The first set of issues concerns whether the petitioner has properly established that the claimed business bad debts became worthless during the taxable year in issue, and if so, whether they are business or nonbusiness bad debts within the terms of section 166 and the regulations thereunder. Secondly we must determine whether the claimed "compensation for services" expense is properly deductible within the terms of sections 62 and 162. To sustain the bad debt deductions claimed under section 62(1), petitioner must *31 show that they would be allowed under section 166 and the accompanying regulations. Under these provisions petitioner must show the existence of a bona fide debt and that it became worthless during the taxable year in issue. [9]Section 166(a), sections 1.166-1(a), 1.166-1(c), Income Tax Regs.
To be entitled to deduct these debts without limitation, petitioner must also show that these debts bore a relationship to his trade or business. Section 166(d) (2), section 1.166-5(b), Income Tax Regs. The regulations indicate that only a "proximate" relationship is needed. Section 1.166-5(b) (2), Income Tax Regs. However, the Supreme Court in United States v. Generes, 405 U.S. 93 (1972) rejected the pluralistic tort concept of "proximate" and adopted the singular concept of "dominant motivation." Generes, supra, 101-105. In so doing the Supreme Court said in Generes, supra at 105: The Regulations' use of the word "proximate" perhaps is not the most fortunate, for it naturally tempts one to think in tort terms. The temptation, however, is best rejected, and we reject it here. In *32 tort law factors of duty, of foreseeability, of secondary cause, and of plural liability are under consideration, and the concept of proximate cause has been developed as an appropriate application and measure of these factors. It has little place in tax law where plural aspects are not usual, where an item either is or is not a deduction, or either is or is not a business bad debt, and where certainty is desirable. The determination of taxpayer's dominant motivation is a factual question on which the taxpayer bears the burden of proof. Oddee Smith, 55 T.C. 260 (1970), remanded for consideration in light of Generes at 457 F.2d 797 (5th Cir. 1972); opinion on remand 60 T.C. 316, 318 (1973); section 1.66-5(b), Income Tax Regs. To apply this standard we must determine the taxpayer's overriding reason incurring the obligation and, in so doing "compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." Generes, supra at 104. Failing to meet this business debt standard, petitioner's deduction would be subject to the limitations as provided in section 166(d) for nonbusiness debts. A further consequence of section 166(d) is that *33 nonbusiness debts may not be deducted until they become totally worthless. Section 166(d) (1) (A), section 1.166-5(a) (2), Income Tax Regs. The characterization of these debts is important since the debts are either all business or all nonbusiness since the Code does not provide for allocation between the two categories. Generes, supra at 96. Petitioner argues that the primary motivation for these loans was, in each case, to increase his chances to obtain additional work for Saia Electric and, with respect to the loans to Ty-Mac, to gain experience and knowledge in the outdoor electrical sign business. These motives are cited as having a direct and proximate relations to petitioner's business, qualifying the debt as a business debt. While noting that as president and major stockholder of Saia Electric petitioner was responsible for soliciting new business, we must also remember that Saia Electric and petitioner are separate entities each engaged in a separate trade or business. It is well established that the business of the corporation may not be treated as the business of employee-stockholder. Burnet v. Clark, 287 U.S. 410 (1932), Phil L. Hudson, 31 T.C. 574, 583 (1958), and *34 cases cited therein. In Robert E. Imel, 61 T.C. 318 (1973), the taxpayer was an officer and minority shareholder in a bank. As part of his duties as a bank officer, he personally made loans that the bank could not make. The purpose of these loans was to build up his own business and induce potential customers to use the bank. Subsequently the taxpayer sustained a loss on one of his loans and this Court had to characterize the debt as a business or nonbusiness bad debt. After rejecting the taxpayer's first contention that his lending activities constituted a trade or business of its own, [10] this Court considered the alternative argument "that the debt was created in connection with his trade or business as a bank executive." Robert E. Imel, supra at 323. In rejecting this argument this Court, in applying Generes, supra, said at p. 324: Petitioner testified that as a bank officer, it was part of his duties to make loans to individuals to whom the bank could not make loans directly. Petitioner stated that these loans created new business for the bank and enabled the bank to become a depository for additional funds from these individuals and corporations. The creation of new business *35 undoubtedly would benefit the business of the bank. Evidence that the bank benefited from the making of these loans, however does not establish that the loans were proximately related to petitioner's business as an employee of the bank. Petitioner has failed to explain the relationship between the creation of new business for the bank and his retention of his employee position. The record does not suggest that petitioner would have lost his job had he not made these loans. The record does establish, however, that petitioner and his family controlled the Pampa bank and that petitioner had a substantial investment in the bank. We conclude that petitioner's dominant motive for making the loan in issue was to secure new business for the bank and thereby protect his investment rather than retain his employee status. Accordingly, petitioner's $5,000 loss is a nonbusiness bad debt subject to short-term capital loss treatment. We find the above statement incorporates much of what could be said about the record in the case at bar. In addition, Saia Electric never *36 had any connection with the loans in question. Petitioner's equity and creditor interests in Ty-Mac were consistently reflected on his personal financial statements, and the Capital City stock, when acquired by petitioner, was transferred to petitioner's son-in-law's name. We find the loan to Matthews to be personal in nature. There is also no evidence in the record that shows that petitioner had formal corporate authorization to make these loans on its behalf. We hold, therefore, the debts in issue to be nonbusiness bad debts since they were not created in connection with the trade or business of the petitioner. As nonbusiness bad debts, petitioner could still derive some benefit from his Ty-Mac and Capital City losses if he can show that they became totally worthless during the taxable year in issue. However, we do not believe that petitioner has presented sufficient evidence that either of these debts became worthless during 1970. See section 1.166-2, Income Tax Regs.
During 1970 petitioner had reason to believe that Ty-Mac was in financial trouble, but the record reveals that the situation was not hopeless. Ty-Mac's balance sheet as of October, 1970 reflected salable assets *37 in which apparently legitimate purchasers were interested, and it continued to operate at least through July, 1971. Petitioner's own personal financial statements valued the past due Ty-Mac obligation at $30,000. Petitioner ultimately did sell his interests in Ty-Mac in April, 1972 for $3,000 and a $22,000 installment note. Petitioner also received a partial payment of his obligation in 1972. Based on these facts, we find it difficult to believe that Ty-Mac's obligations to petitioner were totally worthless as of December 31, 1970. See Richard R. Riss, Sr., 56 T.C. 388, 405-410 (1971). During 1970 petitioner paid the $20,000 renewal note that had been signed on behalf of Capital City and endorsed individually by Watson and Carrigan and secured by petitioner. The original note was signed by Watson, Carrigan and petitioner. The proceeds of the loan were used by Watson and Carrigan to buy out unhappy shareholders of Capital City. After paying the note petitioner sued Watson and Carrigan for reimbursement. This suit was dropped with prejudice before judgment was entered. In consideration for dropping the suit petitioner received Watson's and Carrigan's rights to their stock in *38 Capital City. This stock was ultimately transferred to petitioner's son-in-law. As part of this transaction Carrigan testified that he received a check for $4,000. At that time the stock's worth was questionable. Watson testified that he thought the stock was worth $250,000. However this testimony was completely unsupported. The record reveals that there were several substantial corporate debts outstanding. Petitioner has not introduced any specific evidence to prove the value, if any, of the stock he received. Without this evidence we cannot determine the extent of petitioner's loss since it would be limited to the difference between his basis in the debt and the stock's value. Commissioner v. Spreckels, 120 F.2d 517 (9th Cir. 1941), affirming a Memorandum Opinion of this Court. When the debt became due both Watson and Carrigan were in poor financial condition, but neither man declared bankruptcy. They both testified that payment of this debt would have proved difficult, but both mentioned the possibility of arranging an installment payment schedule. Watson even testified that he approached petitioner's attorney, at that time, in an effort to arrange a payment schedule, *39 but this effort was not pursued. Petitioner has introduced no evidence detailing what action he took to collect the debt before instituting the suit. Based on these facts, we do not believe that petitioner has adequately proved the worthlessness of this debt as of December 31, 1970 or the extent, if any, of his loss. Petitioner, on brief, attempts to fit the Capital City debt within the terms of section 166(f).If successful petitioner will not be hampered by the nonbusiness bad debt provisions of section 166(d). Section 1.166-8(a) (2), Income Tax Regs.To be successful, petitioner, among other things, must show that "the proceeds * * * [of the obligation] were used in the trade or business of the [borrowers]" and "the obligation of the [borrowers] to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment." Section 166(f). The record reveals that the proceeds of this loan were used by Watson and Carrigan to purchase the Capital City stock of their fellow shareholders.[11] As such the proceeds were used primarily for the purpose of investing which was not their trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963), *40 Robert E. Imel, supra at 325. Petitioner's reliance on Axelrod v. Commissioner, 320 F.2d 327 (6th Cir. 1963) reversing 37 T.C. 1053 (1962) is misplaced since there the funds were used to preserve a going noncorporate business. We find, therefore, that the proceeds of the obligation were not used in the trade or business of the borrowers (Watson and Carrigan) and that this statutory requirement has not been met.In addition, as noted above, we do not believe that petitioner has sufficiently established the obligation of Watson and Carrigan to be worthless at the time petitioner made the payment. Petitioner and Smith were close personal friends. On several occasions petitioner advanced money to Smith based on verbal agreements. On one occasion petitioner endorsed a $10,000 note for Smith. Smith died still owing the note which petitioner ultimately paid. This payment was the basis for petitioner's $11,043.61 "compensation for services" expense. Respondent disallowed this deduction, determining that the amount claimed did not constitute an ordinary and necessary business *41 expense. The petition herein was addressed solely to claiming error in this determination.The answer, in relevant parts, merely denied the allegation. The pleadings were without amendment. On brief petitioner attempts to show a debtor-creditor relationship between petitioner and Smith and that this amount should be deductible as a bad debt. Respondent, in his reply brief, objects to this argument and claims that petitioner is attempting to raise a new issue in his brief. We agree with the respondent, therefore petitioner's bad debt argument will not be considered.In Eleanor C. Shomaker, 38 T.C. 192, 201 (1962) this Court said: We have consistently held that since the primary purpose of pleadings is the joinder of issue between the parties, issues attempted to be raised by brief will be disregarded. [Citations omitted.] See James G. Maxcy, 59 T.C. 716, 728 (1973), cf. Estate of Akos Anthony Horvath, 59 T.C. 551 (1973). This "compensation for services" expense was also claimed by petitioner as a deduction from gross income under section 62(1). To succeed petitioner must show that it would be allowed under section 162(a) (1). Petitioner testified that he had many conversations *42 with Smith regarding petitioner's business operations and expected them to continue. The note was endorsed in expectation of these future services. However, petitioner testified in generalities. He did not cite any specific instances of Smith's assistance. Smith died in possession of an undivided one-half interest in 300 shares in O.K.C. This stock had a stipulated value of approximately $8,200 between January and March, 1971. In January, 1971 the Smith heirs, joined by Smith's widow, assigned their rights in this stock to petitioner.They also agreed to enter into an agreement regarding the distribution of proceeds from any sale of the stock.Petitioner testified that it was his intention that he would be reimbursed from the sale proceeds with any additional proceeds going to the Smith heirs. This intention, coupled with petitioner's failure to cite any specific use of Smith's services, tends to obscure the compensation element as claimed by petitioner. Here too, we must remember that Saia Electric and petitioner are separate entities engaged in separate businesses. Petitioner has failed to show a relationship between Smith's services and his trade or business, or that the compensation *43 was for services rendered. Respondent's disallowance of this deduction must be upheld. Decision will be entered for the Respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as amended. ↩
2. Saia Investments was a sole proprietorship used to maintain petitioner's investment activities. ↩
3. In addition to the promissory note given to petitioner in 1968, petitioner received a demand note for $13,500 in June, 1971 just prior to the law suit.↩
4. This debt was reflected in petitioners' personal financial statement prepared as of June 30, 1971, valued at $30,000 and the equity interest was valued at zero. ↩
5. The record does not indicate why the March, 1970 note was signed differently from the earlier note. ↩
6. The record does not indicate the lender's actions against Watson and/or Carrigan or petitioner's actions against Watson and/or Carrigan to collect the note, or that petitioner actually paid the note. ↩
7. The record does not explain the difference between the $11,043.69 deduction and the $10,000 note that petitioner paid. Apparently it is due to interest. 8. SEC. 62. ADJUSTED GROSS INCOME DEFINED. For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions: (1) Trade and Business Deductions. - The deductions allowed by this chapter (other than by part VII of this subchapter) which are attributable to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * * (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * * (f) Guarantor of Certain Noncorporate Obligations. - A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment. ↩
9. Respondent does not challenge the existence of a bona fide debt in any of the transactions under examination. ↩
10. In the case at bar, petitioner does not allege that his investment activities constituted a trade or business of its own. ↩
11. We find this notwithstanding the fact that the maker of the renewal note was Capital City. See footnote 5, supra. ↩