NORTH ARK. MILLING CO., INC. *v.* LIPARI.

5-2064                                   333 S. W. 2d 713

Opinion delivered April 4, 1960.

*Thomas B. Tinnon,* for appellant.

*Danuser* and *Pierce,* for appellee.

J. SEABORN HOLT, Associate Justice. Leon and Pearl Lipari, husband and wife, appellees (and cross appellants), filed their complaint against appellant, North Arkansas Milling Company, Inc., and Archer-Daniels-Midland Company, alleging: "That the appellee, Leon Lipari, 'was employed by an officer of the defendant, North Arkansas Milling Company, Inc., which is the agent for Archer-Daniels-Midland Company, defendant, on or about March 10, 1957, to brood turkeys and said defendant agreed to pay said plaintiffs the sum of twenty cents (20¢) per turkey brooded. Pursuant to said contract of employment, the plaintiffs brooded 4,713

turkeys over a period of eight weeks . . . for which said defendant is indebted to said plaintiffs in the sum of $942.60. After said turkeys were brooded, the said officer, employee, or agent of North Arkansas Milling Company, Inc., employed said plaintiff, Leon Lipari, to care for said turkeys, including feeding and raising same, it being agreed and understood by the said parties that the plaintiffs would be paid a reasonable sum for said services rendered' . . .'' and: ''The said defendant, Archer-Daniels-Midland Company, by fraudulent misrepresentations and willful misconduct induced the plaintiffs to execute a chattel mortgage dated March 13, 1957, and other documents the nature of which is not known by the plaintiffs for the fraudulent purpose of attempting to create an indebtedness and obligation to said defendant against said plaintiffs by reason of said instruments; the said defendant, Archer - Daniels - Midland Company, by reason of said fraudulent instruments has made a demand against these plaintiffs to pay an alleged indebtedness claimed in the sum of approximately $1,600.00. The plaintiffs deny that they are indebted to said defendant in any sum and pray that said fraudulent mortgage and any other fraudulently secured instruments be canceled, set aside and forever held for naught.'' They prayed for judgment against both Archer-Daniels-Midland Company and North Arkansas Milling Company, Inc., in the total amount of $2,356.60, and that said chattel mortgage be canceled. Appellant, North Arkansas Milling Company, Inc., answered with a general denial and specifically denied that the Liparis were ever employed by it for any purpose. Archer-Daniels-Midland Company also answered with a general denial and in addition, filed a cross complaint against Leo and Perarl Lipari, praying for a decree based on some 53 notes and for a foreclosure of a chattel mortgage given by the Liparis to it in the amount of $1,680.91 plus attorney's fee. The Liparis answered with a general denial. A trial resulted in a decree which contained these recitals: ''As between plaintiffs and the defendant, North Arkansas Milling Company, Inc., upon plaintiffs' claim for the brooding

of the turkeys by plaintiffs, Leon Lipari and Pearl Lipari (they should have a decree), and against the defendant, North Arkansas Milling Company, Inc., in the amount of $942.60. The court further finds in favor of the plaintiffs against the defendant, North Arkansas Milling Company, Inc., for the reasonable value of services rendered by plaintiffs in caring for the turkeys for a period of approximately 80 days beyond the brooding period in the amount of $250.00, making the aggregate amount of the judgment to be entered in favor of the plaintiffs against the North Arkansas Milling Company, Inc., in the sum of $1,192.60.

"On the issue as between the plaintiffs involving the notes and chattel mortgage executed by the Liparis in favor of the defendant, Archer-Daniels-Midland Company, the Court finds that the evidence does not warrant the cancellation of said instruments. The Court further finds that after a sale of the turkeys by the mutual consent of both the mortgagor and mortgagee, and the application of the proceeds of the sale upon the indebtedness evidenced by the notes and mortgage, there remained an unpaid balance due Archer-Daniels-Midland Company in the amount of $1,331.73, and there is further due said company the sum of $105.00 representing interest upon the $3,500.00 note dated May 6, 1957, until November 4, 1957, on which date the Court finds that the principal of this note was paid in full, when the credit of $7,944.89 was made. The Court finds that on the unpaid balance of $1,331.73, evidenced by the delivery receipt notes, interest is due only from December 31, 1957, to the present date, in the amount of $126.40, making the aggregate judgment for principal and interest to be entered in favor of Archer-Daniels-Midland Company against Liparis, in the amount of $1,563.13, plus the further sum of $150.00 for attorney fees which the court allows for the plaintiffs attorney, as authorized by the notes. The decree shall assess one-half of the court cost herein against North Arkansas Milling Company, Inc., and one-half against the plaintiffs, Leon Lipari and Pearl Lipari." This appeal followed.

.

For reversal, appellant relies on two points: "I. That the trial court's findings as between the plaintiffs, Leon Lipari and Pearl Lipari, and the defendant, North Arkansas Milling Company, (appellant) upon plaintiffs' claim for the brooding of the turkeys and against the defendant, North Arkansas Milling Company, Inc., (appellant) in the amount of $942.60 is contrary to the evidence and law. II. That the trial court's findings in favor of the plaintiffs, (appellees), Leon Lipari and Pearl Lipari, as against the defendant, North Arkansas Milling Company, Inc., (appellant) for the reasonable value of services rendered in caring for the turkeys in the amount of $250.00 is contrary to the evidence and law."

We do not agree to either contention. The great preponderance of the evidence, we think, supports the chancellor's findings and decree.

Mr. Lipari testified that he and his wife made an agreement with appellant, North Arkansas Milling Company, Inc., to the effect that the company would furnish him with day-old turkey poults to care for and raise until they were eight weeks old; that all Lipari was to do was to furnish his labor and care for the turkeys until they were eight weeks old; that the company agreed to furnish and deliver all the necessary feed and to pay 20¢ per head for Lipari's labor in caring for them. He admitted that he (Lipari) and his wife signed a chattel mortgage which, he testified, appellant company represented was just to guarantee "that the turkeys would be here when we want them and the mortgage is really on the turkeys." Lipari further testified that appellant company had not paid him anything for brooding the turkeys and that they brooded 4,713 head until eight weeks old, for which appellant owed him twenty cents (20¢) per head. He further testified: "Q. How many days after these turkeys were 8 weeks old did you care for them? A. We took care of them up until October 28, or sometime along there, when they took them out to market. * * * THE COURT: It is in evidence that the turkeys came in on May the 6th, and any con-

tract would begin at that time, and continue until the turkeys were disposed of on October 28. * * * Q. What would you say is the reasonable value of your services for taking care of these turkeys until they were taken away, including the use of your tractor and fuel: A. I just figured that it was worth $10.00 a day for the use of the tractor and labor and fuel. I told him that. I am not a guy who likes to override the other man, but that I felt like I ought to have $10.00 per day for the use of myself and my tractor.'' Mr. Menard Beard assisted Lipari in caring for these turkeys.

Mr. Jack Stewart, president of appellant company, testified: ''Question: Did you go out to their (the Lipari's) place and pick up the waterers and feeders? Answer: I did not. Question: Did you have one of the men from the North Arkansas Milling Company do that? Answer: Well, he was working for the company. Question: Did he pick up these items? Answer: Yes. * * * Question: Did you talk to him [Mr. Beard] about taking care of the turkeys on the Lipari property? Answer: Yes. Question: Did you discuss what the salary arrangements would be? Answer: Vaguely. Question: What was said about that? Answer: I was the 'go-between' Lipari and Mr. Beard, because they were wanting somebody to help them grow the birds and feed them, but as far as the money involved, I don't remember. Question: Where were you when you talked with him? Answer: In my office.''

Mr. Beard testified: ''Question: Did you ever hear Mr. Stewart make any statement about whose turkeys they were? Answer: He said they were his turkeys. Question: Did he tell you that? Answer: Yes. We were out by the brooder house. Question: Why did he tell you that? Answer: He was talking to Mr. Lipari, and he was telling them about it.''

While the testimony is somewhat conflicting, however, as indicated, we have concluded that the findings and decree are not against the preponderance thereof. The chancellor evidently believed appellees' testimony.

In the recent case of *Brown* v. *Bridges*, 227 Ark. 1006, 304 S. W. 2d 939, we said: "The chancellor saw and heard appellee testify, had ample opportunity to observe his appearance on the witness stand, and was in a position to best determine whether the witness was telling the truth. This was a finding of fact and we have held that we will not reverse a chancellor's decree unless his findings are against the weight of the evidence. *Lupton* v. *Lupton*, 1946, 210 Ark. 140, 194 S. W. 2d 686."

On appellees' cross-appeal they say: "If an agent or employee is compelled to pay a debt which should be paid by his principal, the agent is subrogated to rights of the creditor. The prayer for 'all other relief to which they are entitled' would require the Equity Court to recognize the cross appellants' right to subrogation as against their principal where the principal is a party to the suit." Before appellees can claim subrogation to the rights of their principal, appellant, they must first show that they have paid a debt or obligation of their principal which they did not do. "Before the surety can claim the right to the benefit of any of the securities, he must first pay the entire debt of the principal for the payment of which the securities were given. As is said in the case of *Bank of Fayetteville* v. *Lorwein*, 76 Ark. 245: 'The right of subrogation can not be enforced until the whole debt is paid, and until the creditor be wholly satisfied, there ought to and can be no interference with his rights or his securities which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim,' " *Barton* v. *Matthews*, 141 Ark. 262.

Affirmed, both on direct and cross-appeal.