ROBERT E. IMEL AND NANCY J. IMEL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5799–70. Filed November 29, 1973.

*Ronald M. Mankoff* and *Charles M. Meadows, Jr.*, for the petitioners.

*William A. Goss*, for the respondent.

WILES, *Judge:* Respondent has determined the following deficiencies in petitioners' Federal income taxes:

| Taxable year | Deficiency |
|---|---|
| 1965 | $3, 364. 00 |
| 1968 | 6, 006. 87 |

The issues remaining for decision are:

1. Whether a $5,000 loss incurred by petitioner in 1968 on the worthlessness of a debt is allowed as a deduction pursuant to section 166 (a), I.R.C. 1954.[1]

2. Whether the proceeds of a $100,000 loan were used in the trade or business of the borrower so that a $30,000 payment made by petitioner in 1968 in settlement of his liability as a guarantor on such loan is deductible under section 166 (f).

3. Whether section 166 determines exclusively the deductibility of the $30,000 loss that petitioner sustained in 1968 in settlement of his liability.

4. Whether the legal and travel expenses incurred by petitioner in obtaining a settlement of his liability as guarantor of a note are deductible pursuant to section 165 (c) (2).

### FINDINGS OF FACT

Some of the facts have been stipulated and have been found accordingly.

Petitioners are Robert E. Imel (hereinafter referred to as petitioner) and Nancy J. Imel, husband and wife who resided in Pampa, Tex., at the time of the filing of the petition herein. They filed a joint Federal income tax return for the taxable years 1965 and 1968 with the district director of internal revenue in Dallas, Tex.

Since 1960 petitioner has been vice president and trust officer of the Citizens Bank & Trust Co. of Pampa, Tex., in which bank he also holds a minority stockholder interest. The value of petitioner's investment interest in the Pampa bank was approximately $50,000 in 1965 and approximately $80,000 in 1968. The petitioner received salaries from the Pampa bank in the amounts of $15,492 in 1965 and $21,200 in 1968. His duties at the Pampa bank include building up new business, collecting notes, making bond investments, and dealing with the Federal Reserve. Petitioner in the course of carrying out his duties as a bank officer has made personal loans to certain individuals and corporations,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated.

which loans the bank could not make. Between 1965 and 1968, he made seven or eight ABC oil payment loans. On March 1, 1968, he made a $36,000 loan to Midwest Chemical Co., which loan was evidenced by a note. In 1965 petitioner's interest income from these loans was $2,621. He also received interest income in 1966 and 1967. The purpose of making these loans was to build up business for petitioner himself and to induce potential customers to deposit funds in the Pampa bank.

On August 1, 1965, petitioner made a $5,000 loan evidenced by a note to W. E. Pritchett, petitioner's stepfather-in-law. Pritchett's purpose for borrowing these funds was to secure an option to buy stock in Capital Life Insurance Co. Pritchett had been in the insurance business since 1948 when he was employed by Farmers Insurance Group Co. in Arkansas. He became district manager for Farmers Insurance Group Co. in 1949 and later became their sales and claims manager in Arkansas. He remained in this position for 14 years. As the result of conversations with a fraternity group, Pritchett in 1959 devised a life insurance policy that superimposed an endowment feature so that fraternity brothers would be permitted to assign this endowment to their fraternity and not affect their rights under the policy. Pritchett offered to let Farmers Insurance Group Co. market this policy but that company decided not to enter into such a program.

After approaching several other insurance companies with this promotion idea, Pritchett entered into an agreement with Washington Independent Life Insurance Co. As a result of this agreement Pritchett became a stockholder and an executive vice president of that company. He left Washington Independent Life Insurance Co. about a year later because they did not have adequate funding to handle the program of marketing his new policy.

After having several meetings with members of certain fraternity groups, Pritchett decided to start his own company to market his policy. He decided to purchase a small insurance company which had an old charter because such a charter was necessary before the company would be admitted into several States and before the stock could be marketed publicly. He attempted to purchase an insurance company in Manhattan, Kans., and finally purchased a company in Columbia, Mo. After the other shareholders of this company found out that he had purchased the controlling interest, Pritchett was faced with shareholder dissent. The dissenting shareholders offered to buy Pritchett's stock at a price that would produce a $10,000 profit for him. Pritchett agreed to sell his stock to the shareholders.

Eventually Pritchett entered into an agreement with Lloyd G Hobbs who was the principal stockholder of Capital Investors Life Insurance Co. (hereinafter referred to as Capital Investors). Pritchett

made an arrangement whereby he would buy 75 percent of the stock of the company. Pritchett would pay $4 per share for the stock in this company. The agreement also provided that Capital Investors would pay a salary to Pritchett and that he would receive an override on the policies in force. In addition he was to receive incentive stock bonuses based upon the policies issued. Pritchett and another individual put up $25,000 to acquire an option to purchase the stock in accordance with the agreement with Hobbs.

At this time the stock market for life insurance stock declined such that Pritchett had difficulty finding additional investors and he had to put up an additional $25,000 to hold his option. At this time he contacted petitioner regarding the $5,000 loan discussed previously. The petitioner agreed to make the loan to Pritchett because he foresaw the possibility of becoming a director of Capital Investors and because he thereby would be able to control where the company's funds would be deposited.

Still in need of more funds to close the agreement with Hobbs, Pritchett contacted National American Life Insurance Co. (hereinafter referred to as National American) in Baton Rouge, La., regarding a "take-out" letter for a $100,000 loan. National American agreed to give him a "take-out" letter because they were going to service the policies for Pritchett and were going to reinsure Capital Investors. National American would also offer their facilities in other States to sell Pritchett's policy and allow him to buy back that insurance once Capitol Investors became qualified to do business in additional States.

Pritchett attempted to borrow additional funds from the City National Bank of Fort Smith, Ark. (hereinafter referred to as City National Bank), on the strength of the "take-out" letter from National American. City National Bank, however, told him that in addition to the "take-out" letter he would have to obtain three additional signatures on the note. Pritchett again approached the petitioner who agreed to sign the note. Pritchett used the proceeds of the loan from City National Bank to purchase stock in Capital Investors, the name of which was subsequently changed to National Fraternity Life Insurance Co. (hereinafter referred to as National Fraternity). All of the purchased shares were issued in Pritchett's name. Pritchett intended to pay off the $100,000 note by later selling the stock to the public.

Petitioner's purpose in signing the note was to assure that he would become a director of National Fraternity and to assure that National Fraternity's funds would be deposited in his bank. Petitioner never purchased any stock in National Fraternity.

Pritchett later purchased the remaining shares owned by Hobbs and pledged them back to Hobbs to secure the purchase price. As a result

Pritchett owned all of the stock of National Fraternity. Because National Fraternity needed additional funds for expansion, Pritchett on behalf of the company sought permission of the Arkansas Securities Commission to sell stock in National Fraternity to the public. Pritchett entered into an agreement with Preferred American Group, Inc., a holding company doing business in Florida, whereby Preferred American Group, Inc., agreed to purchase Pritchett's stock in National Fraternity. Preferred American Group informed Pritchett that it had a block of mortgages that it would put into National Fraternity. In accordance with the agreement with Preferred American Group, Inc., Pritchett was to receive a salary of $12,000 and in addition he was to receive an override of 3 percent of the new business and 2 percent of all renewals. Pritchett's title was to be senior vice president. Preferred American Group, Inc., was to assume the $100,000 note evidencing the loan from City National Bank. Pritchett, however, failed to get a release from his liability by virtue of this assumption.

After all the books and records of National Fraternity were moved to Florida and Preferred American Group, Inc., took over the actual operations of the company, the financial condition of National Fraternity began to deteriorate. Preferred American Group, Inc., failed to contribute the mortgages which they agreed to put into the company and also failed to file all the annual reports required by the State of Arkansas. Eventually National Fraternity was placed in bankruptcy. The stock that Preferred American Group, Inc., had received from Pritchett was returned to him, and the stock was subsequently turned over to the insurance commissioner for the State of Arkansas pursuant to an order from that office.

National American became the holder in due course of the $100,000 note given to City National Bank, and suit was brought against the four signers by National American in 1968. In connection with the suit filed against him, petitioner traveled to Baton Rouge, Little Rock, Fort Smith, and Wichita. As a result of his negotiations, petitioner obtained a settlement of his liability from National American upon his payment of $30,000. In obtaining this release petitioner expended $5,980.50 for attorney's fees and travel expenses.

OPINION

The first issue is whether the $5,000 loss that petitioner sustained in 1968 when a debt owed him by W. E. Pritchett became worthless is deductible as a bad debt described in section 166 (a) (1) [2] or as a non-

---

[2] SEC. 166. BAD DEBTS.
  (a) GENERAL RULE.—
    (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

business bad debt described in section 166 (d).[3] Petitioner contends that he is entitled to deduct from ordinary income a bad debt loss in the amount of $5,000 because of the worthlessness of a debt due from W. E. Pritchett in the year 1968. Respondent contends that the loss is deductible only as a nonbusiness bad debt and, therefore, must be treated as a loss from the sale of a capital asset held for not more than 6 months. Although conceding that the $5,000 loan to Pritchett created a bona fide debt that became worthless in the year 1968, respondent denies that the debt was created in connection with petitioner's trade or business either as an employee of the Citizens Bank & Trust Co. of Pampa, Tex., or as a lender.

As support for his contention that he was in the business of lending money, petitioner testified that he made eight or nine loans from 1965 through 1968. The right to deduct bad debts as business losses is applicable only to the exceptional situations in which the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business. *H. Beale Rollins*, 32 T. 604 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960) ; *Max M. Barish*, 31 T.C. 1280 (1959) ; *Stuart M. Sales*, 37 T.C. 576 (1961).[4] We do not find that the making of eight or nine loans in the course of a 4-year period elevates that activity to the status of a separate business. On the basis of the evidence presented, we conclude that the petitioner was not engaged in a separate business of making loans.

Alternatively, petitioner argues that the debt was created in connection with his trade or business as a bank executive. The question of whether the debt is a business or nonbusiness bad debt is essentially one of fact, the determination of which depends upon whether the debt is "proximately" related to the trade or business of the taxpayer. Sec. 1.166–5(b) (2),[5] Income Tax Regs. *Estate of Martha M. Byers*,

---

[3] (d) NONBUSINESS DEBTS.—

  (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

    (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

    (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

  (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

    (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer ; or

    (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[4] See also *Leonard S. Krause*, T.C. Memo. 1967–68 ; *Lloyd E. Mangrum*, T.C. Memo. 1960–136.

[5] Sec. 1.166–5 Nonbusiness debts.

  (b) *Nonbusiness debt defined.* For purposes of section 166 and this section, a nonbusiness debt is any debt other than—

    \*       \*       \*       \*       \*       \*       \*

  (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been

57 T.C. 568 (1972), affirmed per curiam 472 F. 2d 590 (C.A. 6, 1973). The Supreme Court has held that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, the proper measure is that of dominant motivation of the taxpayer in making the loan and that only significant motivation is not sufficient. *United States* v. *Generes,* 405 U.S. 93 (1972).

Petitioner testified that as a bank officer, it was part of his duties to make loans to individuals to whom the bank could not make loans directly. Petitioner stated that these loans created new business for the bank and enabled the bank to become a depository for additional funds from these individuals and corporations. The creation of new business undoubtedly would benefit the business of the bank. Evidence that the bank benefited from the making of these loans, however, does not establish that the loans were proximately related to petitioner's business as an employee of the bank. Petitioner has failed to explain the relationship between the creation of new business for the bank and his retention of his employee position. The record does not suggest that petitioner would have lost his job had he not made these loans. The record does establish, however, that petitioner and his family controlled the Pampa bank and that petitioner had a substantial investment in the bank. We conclude that petitioner's dominant motive for making the loan in issue was to secure new business for the bank and thereby protect his investment rather than retain his employee status. Accordingly, petitioner's $5,000 loss is a nonbusiness bad debt subject to short-term capital loss treatment.

The second issue for decision is whether the proceeds of the $100,000 loan were used in W. E. Pritchett's trade or business so that the $30,000 payment that petitioner made in settlement of his liability as a guarantor of the loan is deductible as a bad debt loss. Section 166 (f)[6] provides generally that a payment by a taxpayer in discharge of his liability as a guarantor of a noncorporate obligation the proceeds of

---

incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. The use to which the borrowed funds are put by the debtor is of no consequence in making a determination under this paragraph. For purposes of section 166 and this section, a nonbusiness debt does not include a debt described in section 165(g)(2)(C). See § 1.165–5, relating to losses on worthless securities.

[6] SEC. 166(f). GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.

which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within the taxable year.

Respondent concedes that the only issue presented in determining the applicability of section 166(f) is whether the proceeds of the August 16, 1965, note were used in the principal borrower's trade or business. Respondent argues that by using the proceeds to purchase common stock of National Fraternity, Pritchett established that he was an investor and not a promoter of corporations. Petitioner contends that Pritchett used the proceeds in his business of managing and promoting insurance companies.

We are not persuaded by petitioner's argument that Pritchett used the proceeds in his trade or business as an insurance company manager or executive. Pritchett may have anticipated that by gaining control of National Fraternity he could secure for himself an executive position with the company. We believe, however, that his primary motive for purchasing shares of National Fraternity was to invest in a company that would develop and promote a type of insurance policy that he believed had great investment potential. Accordingly, we conclude that Pritchett used the proceeds of the loan for purposes of investing, which is not a trade or business. *Whipple* v. *Commissioner*, 373 U.S. 193 (1963), rehearing denied 374 U.S. 858.

In support of his position, petitioner has cited *Axelrod* v. *Commissioner*, 320 F. 2d 327 (C.A. 6, 1963), reversing 37 T.C. 1053, in which the court held that loan proceeds had been used in the borrower's trade or business when one partner used the proceeds to buy out the partnership interest of the taxpayer-partner who had guaranteed the loan. The facts in *Axelrod* are readily distinguishable from those in the present case. In *Axelrod* the borrower was in the trade or business of operating a restaurant in the partnership form of business. He used the loan proceeds to increase his capital interest in a going noncorporate restaurant business in order to preserve its existence. In the present case, however, Pritchett used the loan proceeds to acquire an interest in a corporate business in which he previously had not owned any interest or held any position.

Alternatively, petitioner contends that Pritchett was in the trade or business of promoting life insurance companies. In support of this argument, petitioner states that Pritchett promoted and sold the stock of three life insurance companies. We are not persuaded that Pritchett established associations with these corporations so that he could develop them as going businesses for sale to customers in the ordinary course. We conclude that Pritchett's associations with several companies were caused by his inability to locate a company that would actively promote the type of insurance policy that he had developed.

Accordingly, we hold that Pritchett did not use the proceeds of the loan in his trade or business and that petitioner is not entitled to a deduction pursuant to section 166(f).

The third issue is whether section 166 determines exclusively the deductibility of the $30,000 loss that petitioner sustained in 1968 in settlement of his liability to National American.

The petitioner contends in the alternative that the payment of $30,000 in settlement of his liability is deductible under section 165(c)(2)[7] as a loss incurred in a transaction entered into for profit. Citing *Putnam* v. *Commissioner*, 352 U.S. 82 (1956), the respondent contends that petitioner's payment of $30,000 is a loss that is attributable to the worthlessness of a debt and is deductible as a bad debt loss or not at all.

In *Putnam* the Supreme Court reasoned that *instanter* upon his payment in full of the guaranteed debt, the guarantor became subrogated to the rights of the creditor in the original debt so that the guarantor's loss, sustained because he was unable to recover from the debtor, must be regarded as a bad debt loss. The petitioner argues that a debt never became due him from Pritchett because he did not acquire a right' of subrogation, as was the case in *Putnam*. Because the petitioner did not pay the whole debt, he did not acquire a right of subrogation under the law of Arkansas, the State in which the loan agreement was executed. *Bank of Fayetteville* v. *Lorwein*, 76 Ark. 245, 88 S.W. 919 (1905); *North Arkansas Milling Co.* v. *Lipari*, 231 Ark. 965, 333 S.W. 2d 713 (1960).

Where the guarantor of the original debt acquires no rights of subrogation because he makes only partial payments, his payments still may be subject exclusively to bad debt treatment if the law implies a promise on the part of the principal to reimburse the guarantor for payments that he makes on the obligation. *Bert W. Martin*, 52 T.C. 140 (1969), aff'd. 424 F. 2d 1368 (C.A. 9, 1970). If we correctly understand Arkansas law, there existed an implied promise on the part of Pritchett to reimburse the petitioner for the amounts he paid in settlement of his liability on the note. In *Shinn* v. *Kitchens*, 208 Ark. 321, 186 S.W. 2d 168 (1945), the court stated that when a surety sues a principal for the amount paid by the surety on the note of the principal, the action is based on an implied contract. In *Griffin* v. *Long*, 96 Ark. 268, 131 S.W. 672 (1910), the court stated that, when one becomes a surety for a principal, a liability arises upon the part of the prin-

---

[7] SEC. 165(c). LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\*        \*        \*        \*        \*        \*        \*

(2) losses incurred in any transaction entered into for profit; though not connected with a trade or business; \* \* \*

cipal to indemnify his surety for any payment which he may be compelled to make for the principal. Although in *Shinn* v. *Kitchens, supra,* the surety paid the whole debt and in *Griffin* v. *Long, supra,* the co-surety paid his proportional share of the judgment on the note, we think it is proper to conclude that an Arkansas court would not reach a different result merely because only a part payment had been made. Such a conclusion is in accord with the weight of authority that, where the surety makes a part payment to a creditor on account of a default by the principal, the latter is under an immediate duty to reimburse the surety to the extent of the payment. See American Law Institute, Restatement of the Law of Security, ch. 4, sec. 106 (1941); 1 Brandt, Suretyship and Guaranty, sec. 228 (3d ed. 1905); Elder, Stearns Law of Suretyship, sec. 11.37 (1951). We therefore conclude that petitioner's loss of $30,000 was attributable to the worthlessness of the debt owed him by Pritchett and that it cannot be deducted under section 165(c)(2) since section 166 exclusively determines whether the loss is deductible.

The fourth issue is whether legal and travel expenses incurred by petitioner in obtaining a settlement of his liability as a guarantor are deductible pursuant to section 165(c)(2).

The petitioner contends that he is entitled to deduct $5,980.50, the amount of legal expenses incurred in obtaining the release, as a loss incurred in a transaction entered into for profit pursuant to section 165(c)(2). In *Marjorie Fleming Lloyd-Smith,* 40 B.T.A. 214 (1939), affd. 116 F. 2d 642 (C.A. 2, 1941), certiorari denied 313 U.S. 588 (1941), and in *Peter Stamos,* 22 T.C. 885 (1954), we held that legal expenses incurred as a guarantor may be deductible under section 165(c)(2). Although these cases were decided before *Putnam,* it is still possible in many circumstances to consider payments resulting from guarantor transactions as payments made in a transaction entered into for profit. *Mozelle Rushing,* 58 T.C. 996 (1972). On the basis of the evidence presented, we believe that the guaranty was given in a transaction entered into for profit. By guaranteeing the loan to Pritchett, the petitioner hoped to assure that he would become a director of National Fraternity and to assure that National Fraternity's funds would be deposited in the Pampa bank, in which the petitioner held a substantial interest. Petitioner thereby would promote his status as an investor. Accordingly, we conclude that the legal and travel expenses incurred by petitioner in order to obtain a release from his liability on the $100,000 note are deductible under section 165(c)(2).

*Decision will be entered under Rule 50.*