CHARLES MARKS AND JOYCE MARKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
MARKS v. COMMISSIONER
Docket No. 12182-81.
United States Tax Court
T.C. Memo 1983-574; 1983 Tax Ct. Memo LEXIS 211; 46 T.C.M. (CCH) 1408; T.C.M. (RIA) 83574; September 19, 1983. Charles Marks, pro se. Janice C. Taylor, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $19,726.02 in petitioners' Federal income tax for 1976, as well as an addition to tax in the amount of $986.30 under section 6653(a) [1] and an excise tax in the amount of $189.09 under section 4973. After concessions by the parties, the only question remaining for decision is whether petitioners are entitled to a deduction for a bad debt loss under section 166 for a loan made by petitioner Joyce Marks to her father. FINDINGS OF FACT Petitioners, husband and wife, filed a joint Federal income tax return for 1976. At the time their petition in this case was filed, they resided in New Orleans, Louisiana. From 1953 to 1963, petitioners (hereinafter Dr. and Mrs. Marks) were residents of Zimbabwe, or Rhodesia (as the country was then called). Dr. Marks is a surgeon, and he was engaged *213 in private surgical practice during this period. At the same time, he was also involved in a business project with his father-in-law, Colin Wernick (Wernick). The business project involved the development of a large tract of land located near the center of Salisbury and was carried on through a corporation known as Robin House (Pvt.), Ltd. (hereinafter Robin House). The shares of Robin House were held in three separate blocks. One block was owned by Wernick through another corporation, another block by Mrs. Marks, and the third by her sister, Shirley Elk. The three blocks of stock were apparently of approximately equal value, but the block owned by Wernick possessed all of the voting power. Dr. Marks is presently chairman of the board of directors of Robin House, and Mrs. Marks is also a director. In 1956, Wernick "wanted to expand the business and required a loan in order to make a down payment on another property." Petitioners agreed to loan him the money, and Mrs. Marks transferred to him certain corporate stock which she owned. Wernick liquidated the stock and deposited the proceeds to the account of C. Wernick Trust (Pvt.) Ltd. The trust then used the proceeds to purchase *214 the voting stock of Henny (Pvt.) Ltd., a corporation which owned the real estate that Wernick wanted. The value of the stock transferred by Mrs. Marks to her father was, at the time of the loan, in Rhodesian dollars, $26R,490. The value in United States dollars was approximately $37,000. As Dr. Marks explained: "The arrangements were that there would be a compounded interest over the ensuing years which would be collected at some time mutually agreed upon." There was no set time for repayment. The agreement was that Wernick would repay the loan "if and when" petitioners needed the money. Petitioners did not request repayment prior to Wernick's death on January 12, 1975. In 1960, exchange control restrictions were introduced in Rhodesia under which funds could not be expatriated without the consent of the exchange control authorities. The situation was such that, when petitioners emigrated to the United States in 1963, they were unable to take their capital with them, although they continued to be recognized by Rhodesian authorities as the owners of their funds and securities which remained in that country. The problem faced by petitioners in obtaining their funds was made *215 even more difficult when the United States and other countries imposed economic sanctions against Rhodesia following its unilateral declaration of independence from Great Britain in 1965. No payments of interest on the loan to Wernick were ever made to petitioners, nor was any unpaid interest added to the balance of the loan on Wernick's records. When Wernick died, the loan was listed among his estate's liabilities, valued at $26R,490, the original amount of the loan. During the administration of Wernick's estate, it became apparent that the sum of its liabilities and the bequests provided for in his will exceeded the available assets. Included in those liabilities were the debt of $26R,490 to Mrs. Marks and a debt of $27R,390 to her sister, Shirley Elk. In a letter to Mrs. Marks, the estate's accountant summarized the situation as follows: Assets
$153R,002.24 Liabilities: Debt to Mrs. Marks
$26R,490.00
Debt to Shirley Elk
27,390.00
Other liabilities
84,599.65
(138,479.65)
Expenses of administration
(7,800.00)
Bequests: To the surviving spouse,
Rachel Wernick
20,000.00
To the University College
of Rhodesia and Nyasaland
9,000.00
Principal required to fund
annuity for Constance May
Shand [1]
10,000.00
(39,000.00)
Deficit
$32R,277.41)
*216 The accountant explained to Mrs. Marks that her father's principal concern had been "the provision of a continuity of funds for the benefit of your Mother during her lifetime"; he also pointed out that the payment of the debts owing to Mrs. Marks and her sister, Mrs. Elk, would reduce the funds available for distribution to their mother and for the other bequests. In addition, he stated that he considered it unlikely that the Rhodesian Exchange Control would permit the transfer of the funds outside the country. The accountant advised Mrs. Marks that: "It becomes important, therefore, for you to consider positively whether to agree to advise the Master that you do not wish to receive payment of the liabilities due to you." Mrs. Marks acted on this advice. In order that the funds which the estate would be able to provide her mother would not be reduced, Mrs. Marks notified the estate's executors that she did not wish to receive payment of her claim and, "insofar as may be necessary," she waived the claim in favor of the estate. For the same reason, Mrs. Marks' sister executed a similar waiver of her claim. Accordingly, Mrs. *217 Marks and her sister entered into an agreement in April 1976 which provided that the estate should pay the bequests made by their father, and pay its liabilities and expenses, other than the debts of $26R,490 and $27R,390, respectively, owed to them. Any amount remaining after these payments had been made was to be divided between Mrs. Marks and her sister in proportion to the amounts owing to them by the estate. The agreement provided further that the amount of $10R,000, which was retained by the estate to be invested for the benefit of Mrs. Shand during her lifetime, would be divided between them at her death, again in proportion to the amounts owed to them by the estate. Mrs. Marks and her sister accepted these amounts to be paid to them as "full and final settlement of the sum of $27,390.00 and $26,490.00 owing to us by the estate." In the estate's "First and Final Administration and Distribution Account," the debts owing to Mrs. Marks and her sister were treated as having been paid. Mrs. Marks and her sister were then treated as having refunded the amounts necessary to make the bequests provided for in Wernick's will. This did not reflect the actual flow of funds, however. *218 It appears, instead, that, as contemplated by the agreement of April 1976, the bequests, expenses, and liabilities of the estate were paid, other than the liabilities owing to Mrs. Marks and her sister. The residue of the estate, $17R,522, was then divided between them in proportion to the liabilities owing to them; $8R,616.32 was distributed to Mrs. Marks and $8R,905.68 to her sister. On February 28, 1977, Mrs. Marks signed an acquittance in which she acknowledged that she had "received from the Estate of the late Colin Wernick * * * the sum of Eight Thousand Six Hundred and Sixteen Dollars and Thirty Two Cents ($8,616.32) in final settlement of the amount paid to me in terms of the First and Final Income and Expenditure Account lodged in the Estate." Although the document stated that Mrs. Marks had "received" the money, the sum was never transferred outside of Rhodesia; petitioners have received no monies in the United States. The funds were apparently deposited to an account in Mrs. Marks' name in Rhodesia. In their Federal income tax return for 1976, petitioners claimed a bad debt deduction of $25,000. This figure was arrived at by subtracting from the original loan of *219 about $37,000 the amount acknowledged in the acquittance to have been received by Mrs. Marks. When translated into United States dollars and rounded off, that amount came to about $12,000. [2] The deduction was denied by respondent in its entirety. OPINION The tax treatment of bad debts depends on whether they are business or nonbusiness debts. Section 166(a) allows a deduction to be taken against ordinary income for debts which become wholly or partially worthless during the taxable year. Section 166(d)(1)(A) provides, however, that, in the case of noncorporate taxpayers, section 166(a) does not apply to nonbusiness debts. Instead, nonbusiness debts which become wholly worthless during the taxable year are treated as short-term capital losses. No deduction is allowed for partially worthless nonbusiness debts. Sec. 1.166-5(a)(2), Income Tax Regs.
Petitioners in the present *220 case treated the estate's obligation to them as a business bad debt, claiming a deduction against ordinary income. The right of an individual to deduct bad debts as business losses is applicable in some exceptional situations in which the taxpayer's activities in making loans were so extensive and continuous as to elevate that activity to the status of a separate business. Imel v. Commissioner,61 T.C. 318, 323 (1973); Sales v. Commissioner,37 T.C. 576, 580 (1961); Rollins v. Commissioner,32 T.C. 604, 613 (1959), affd. 276 F.2d 368 (4th Cir. 1960). The record in the present case reveals only one loan made by petitioners; clearly, they have not demonstrated that they were in the trade or business of lending money. Moreover, the loan did not create a business debt simply because of petitioners' involvement in the land development business being carried on through Robin House. As the Supreme Court has stated: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in *221 the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Whipple v. Commissioner,373 U.S. 193, 202 (1963). In Grauman v. Commissioner,357 F.2d 504, 505 (9th Cir. 1966), affg. a Memorandum Opinion of this Court, a physician claimed a business bad debt deduction with respect to a loan he had made to an incorporated pet shop business of which he and his wife were the sole owners. The court of appeals held that the loan did not create a business debt, quoting the following language from this Court's Memorandum Opinion: There is just nothing in the record on which to base a conclusion that *222 the loan to the pet shop was a business loan in that it was part of a money-loaning business petitioner was then engaged in. Accordingly, we hold that Wernick's debt to Mrs. Marks was a nonbusiness debt. [3] Therefore, petitioners are entitled to deduct it only as a short-term capital loss, and then only upon showing that the debt became wholly worthless during the taxable year. Because we agree with respondent that petitioners have not shown the debt's worthlessness, we hold that they are not entitled to any deduction with respect to it. The accountant's letter referred to in our Findings of Fact makes it clear that the estate had sufficient assets to pay its liabilities and expenses. Only when the bequests were taken into account did the estate's assets become inadequate. Petitioners do not argue that the liabilities of the estate, including the one owed to Mrs. Marks, would not have had a claim on its assets superior to that of the *223 bequests. Out of consideration for Mrs. Marks' mother, petitioners simply chose not to press their claim. "The disinclination of a creditor to force payment does not make a debt 'worthless,' as that term is used in [the statutory predecessor of section 166]." Krack v. Commissioner,1 B.T.A. 1119, 1120 (1925); Davies v. Commissioner,54 T.C. 170, 176 (1970). As stated in our Findings of Fact, the accounting entries in the estate's "First and Final Administration and Distribution Account" treated the debts owed to Mrs. Marks and her sister as having been paid, and the two sisters as having subsequently refunded as much money to the estate as was necessary to make the bequests to their mother and the other beneficiaries. Although these entries did not trace the actual flow of funds, we think that they fairly represented the economic substance of the transaction. Mrs. Marks' decision not to press her claim against the estate, but instead to allow it to distribute its assets to her mother and the other beneficiaries was, in effect, a gift from her to them. As such, it does not give rise to a bad debt deduction. An additional complicating factor *224 in this case is presented by the currency control restrictions in effect in Rhodesia during the period in question. Petitioners point to these restrictions as evidence of the worthlessness of the debt in question. Petitioners argue, in effect, that any waiver by Mrs. Marks was a waiver of a right already made meaningless by the prevailing political and economic situation. In this regard, they cite the principle that-- Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166. Sec. 1.166-2(b), Income Tax Regs. We do not agree that the currency control restrictions establish the worthlessness of the debt. Kahn v. Commissioner,108 F.2d 748 (2d Cir. 1940), affg. 38 B.T.A. 1417 (1938), is on point. The petitioners in that case had claimed deductions for overdue accounts which they had written off as worthless. The debts represented sales to customers in *225 certain South American countries. The debtors were apparently willing to pay, but were forbidden to do so during 1933, the year in question, because their countries had declared embargoes against sending money abroad. The court found that the embargoes were "likely to be only a temporary condition, though of indefinite duration," and held that "[n]either the existence of the embargoes nor the reports received from the firm's South American agents were enough to justify an inference that the debts charged off would never be repaid." Similarly, in Richards & Hirschfeld, Inc. v. Commissioner,24 B.T.A. 1289 (1931), a moratorium imposed under Cuban law which prevented a solvent debtor from withdrawing the funds with which to pay his debt was held insufficient to establish the debt's worthlessness. It is true that, in the present case, petitioners have had to contend with restrictions which have lasted longer than those faced by the taxpayers in the cited cases. [4] We do not find that the difference is so great as to call for a different result, however. Mrs. Marks is, apparently, still recognized by the relevant authorities as the owner of the funds, representing *226 her share in the residue of the estate, which remain in Zimbabwe, and the record does not demonstrate that the probability that those funds will ultimately be made available to her in the United States is so slight that her rights to them have become worthless.[5]
In this regard we note that, were we to hold that the currency restrictions were sufficient to establish the worthlessness of the debt, we could scarcely hold, on the basis of the record before us, that 1976 *227 was the proper year for the deduction to be claimed. Although 1976 was apparently the first year since petitioners' emigration to the United States in which they made inquiries of the exchange control authorities regarding the availability of their funds, restrictions had been in effect since 1960. If the restrictions did, indeed, make the debt worthless, then the record does not establish that they did so in 1976, rather than in some prior year. [6]Estate of Fezandie v. Commissioner,12 B.T.A. 1325, 1333 (1928). Finally, petitioners argue in the alternative that, if their claimed bad debt deduction is not allowed, then they should be allowed a charitable contribution deduction under section 170 for the estate's bequest to the University of Rhodesia and Nyasaland, which was made possible by their forbearance from insisting on payment of the debt owing to Mrs. Marks. The record does not establish, however, that even a direct contribution to the University would qualify as a deduction. Section 170(c) provides generally that only payments *228 to domestic organizations may qualify as "charitable contributions." Accordingly, no deduction is allowable for the bequest in the present case. To reflect the foregoing, and other issues resolved by the agreement of the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
1. Mrs. Shand was a friend of the family.↩
2. To summarize the relevant transactions: ↩
Approximate
Amount in
Equivalent
Rhodesian
in United
Currency
States Currency
Original loan
$26R,490.00
$37,000.00
Distribution from
estate
8,616.32
12,000.00
Claimed bad debt
deduction
$17R,873.68
$25,000.00
3. Cf. Giblin v. Commissioner,227 F.2d 692↩ (5th Cir. 1955), revg. a Memorandum Opinion of this Court, in which the taxpayer's lending activities were far more extensive than those of petitioners in the present case.
4. In Kahn v. Commissioner,108 F.2d 748 (2d Cir. 1940), affg. 38 B.T.A. 1417↩ (1938), for example, the embargoes were lifted in 1934, and almost all of the accounts which the taxpayers had claimed were worthless in the preceding year were paid. 5. Dr. Marks testified that: "There are theoretical * * * accounts * * * but nobody knows what's happening to them. I imagine it's all eaten up in what's now Zimbabwe, in taxes, Rhodesian war taxes, whatever." While we can easily imagine the frustration which petitioners must have undergone in attempting to obtain their funds, this speculation regarding the fate of their accounts does not establish the worthlessness of their claim.↩
6. Petitioners themselves state on brief that "in practical terms the debt was probably worthless and uncollectible in 1965."↩