ROBERT F. McMONAGLE AND ROSEMARY McMONAGLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McMonagle v. Commissioner
Docket No. 24803-85.
United States Tax Court
T.C. Memo 1988-370; 1988 Tax Ct. Memo LEXIS 400; 55 T.C.M. (CCH) 1542; T.C.M. (RIA) 88370; August 15, 1988. Brian R. Mudd, for the petitioners. Joseph R. Peters, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Year
Deficiency
1978
$ 79,833.00
1981
32,136.00
1982
1,877.00
After concessions, [1] the sole issue for decision is whether debts of Home-A-Rama which petitioners guaranteed and eventually paid in 1982 should be treated as worthless business debts or worthless nonbusiness debts. *402 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife and the parents of twelve children. Petitioners resided in De Pere, Wisconsin, at the time they filed their petition with this Court. Petitioners filed joint Federal income tax returns (Forms 1040) for the taxable years 1978, 1979, 1980, 1981, and 1982 and amended income tax returns (Forms 1040X) for the tax years 1978, 1979, and 1981. The returns for the periods involved were filed with the Office of the Internal Revenue Service at Kansas City, Missouri. Petitioners' notice of deficiency was mailed to them on April 11, 1985, and was issued by the Office of the Internal Revenue Service at Milwaukee, Wisconsin. During the tax years in issue, Robert McMonagle ("Robert") operated and was president and chief operating officer of McMonagle Lumber Company, Inc. (sometimes referred to herein after as "McMonagle Lumber" or "the lumber company"), a Wisconsin corporation located in De Pere, Wisconsin. [2] He has held these positions since October of 1960, the year the lumber *403 company began operations. As president and chief operating officer, Robert is in charge and takes care of personnel, sales, purchasing, accounting, income taxes, and merchandising. Robert is, therefore, engaged in the business of a salaried employee performing the many services of a manager of a lumber company, his area of expertise. For the year 1978, Robert and his wife reported a joint gross income amount of $ 274,901. In 1979, their gross income amount equalled $ 257,624. During the years 1978 through 1984, Robert reported the following annual *404 income from McMonagle Lumber: McMonagle Lumber -
Distributive Share of S-Corp.
Salary
Taxable Income [3]
1978
$  84,931
$ 142,557  1979
123,349
89,952  1980
120,705
(S-Corp. 1981
89,205
status  1982
72,000
terminated
1983
1,500
at end  1984
82,300
1979)  Robert set the yearly salary he received from the lumber company and based this salary on McMonagle Lumber's sales and profits. With regard to the distributive shares which he received from McMonagle Lumber in 1978 and 1979, Robert used a portion of these to pay the additional tax liability related to these shares and reinvested the remainder in the lumber company. On his reinvestment, Robert received additional shares of the company's stock. [4]
The revenue of McMonagle Lumber comes from the sale of lumber, plywood cabinets, and other building accessories. During *405 the years in issue, the bulk of these sales were to contractors and retail lumber purchasers. In 1979, approximately 95 percent of the lumber company's sales were to building contractors. During its formative years, McMonagle Lumber's yearly sales averaged $ 500,000. For the period from 1978 to 1983, its total sales figures were as follows: Year
Total Sales
1978
$ 6,376,752.00
1979
5,820,347.00
1980
4,394,113.14
1981
3,629,112.18
1982
3,290,526.59
1983
3,976,840.59
In 1979, and years immediately preceding 1979, McMonagle Lumber serviced between 60 and 70 building contractors. Approximately 20 to 25 percent of the lumber company's sales during this period went to a single building contractor, Green Briar Homes, Inc. The rest of McMonagle Lumber's sales were divided among the other building contractors which it serviced. In 1979, Green Briar Homes, Inc. divided its operations between two divisions -- Green Briar Homes, Inc. of Green Bay ("GBHGB") and Green Briar Homes, Inc. of Sturgeon Bay ("GBHSB"). [5] GBHSB concentrated its efforts on the building of homes in Door County. *406 McMonagle Lumber had begun servicing the needs of GBHSB in 1979. However, Green Brian Homes, Inc., soon requested McMonagle Lumber to open some type of branch office in Door County to service the operations of GBHSB. It was felt that GBHSB's continued growth necessitated that division's purchasing its lumber from a Door County lumber yard. Had McMonagle Lumber not moved into Door County, it was feared at the time that the lumber company would lose sales not only to GBHSB, but also sales to the other Green Briar Homes, Inc. division, GBHGB. [6]
In response to the need to open quickly a facility in Door County, petitioners and the other shareholders of McMonagle Lumber acquired a controlling interest in Home-A-Rama, Inc. ("Home-A-Rama"), a lumber yard located in Door County. They acquired this controlling interest in the late summer or early fall of 1979. Petitioners paid $ 53,190 for their Home-A-Rama shares. After his acquisition of Home-A-Rama shares, Robert served as this Door County company's *407 president. However, he received no compensation as a Home-A-Rama officer. For the calendar year immediately preceding the year in which petitioners decided to invest in Home-A-Rama, McMonagle Lumber's balance sheet reflected an approximate shareholder's equity amount of $ 907,777. Because Robert and his wife held 59.74 percent of the outstanding shares of the lumber company in 1978, their investment in McMonagle Lumber's net worth equalled at least $ 542,300 for that year. When the McMonagle children's shareholder interests are additionally considered, the McMonagle family's investment in the lumber company's 1978 net worth equalled about $ 782,867. On acquiring control of Home-A-Rama, petitioners were required to guarantee an outstanding Small Business Administration loan that the original organizers of Home-A-Rama had obtained and guaranteed. Petitioners were also required to guarantee additional loans to Home-A-Rama, which funds were used to rebuild the inventory of Home-A-Rama and to pay bills for that company which were then outstanding. At the time petitioners acquired their stock in Home-A-Rama, this company was at least $ 90,000 in the red. In 1980, Home-A-Rama *408 made approximately $ 700,000 worth of sales to GBHSB. In 1981, this sales amount increased to $ 900,000. Sales by McMonagle Lumber to Home-A-Rama, a portion of which represented the needs of GBHSB, were as follows: 1980
$ 345,035
1981
683,147
1982
14,000
With the deep recession in the building industry in the early 1980's, Home-A-Rama suffered financial difficulties and went out of business. Home-A-Rama completed the liquidation of its inventory in the spring of 1982. After Home-A-Rama went out of business, petitioners paid, pursuant to their guarantees, the following debts of this Door County company in 1982 and subsequent years: Paid in
Paid in
Years
1982
After 1982
Rich Co. [7]
$    --  $ 30,338
Amerhart
--  9,613
SBA-Bank of St. Bay
62,447
--  SBA-Bank of St. Bay
72
--  WI Retail House
100
--  WDOR Radio
938
--  McMonagle Lumber
60,000
--  Bank of St. Bay - Interest
--  15,243
Bank of St. Bay - Interest
--  5,422
Bank of St. Bay - Interest
28
--  Bay Lakes Mfg.
--  20,028
Bank of St. Bay - Line of Credit   70,000  80,000
$ 193,585
$ 160,644
*409 OPINION We must decide whether petitioners' payments of Home-A-Rama's debts, pursuant to petitioners' guarantees, are deductible as business or nonbusiness bad debts under section 166. Respondent does not question that the debts were worthless or that any right of subrogation that petitioners had was similarly worthless. Under section 166(a)(1), a business bad debt gives rise to an ordinary loss deduction. On the other hand, under section 166(d)(1)(B), a nonbusiness bad debt must be treated as a short-term capital loss subject to the limitations of section 1211. Under section 1.166-9, Income Tax Regs., a payment by a taxpayer in discharge of his or her obligation as a guarantor is treated as a business bad debt if the guarantee is entered into in the course of the taxpayer's trade or business. If, however, the guarantee is entered into as a transaction for profit, but not in the course of the taxpayer's trade or business, the regulation provides that the discharging *410 payment is a nonbusiness bad debt. Although section 166(d)(2) defines a nonbusiness bad debt, [8] the question of whether a debt is a business or nonbusiness bad debt is essentially a question of fact, the resolution of which depends upon whether the debt is "proximately" related to the trade or business of the taxpayer. Sec. 1.166-5(b), Income Tax Regs.; Imel v. Commissioner,61 T.C. 318, 323 (1973). It is well established that being an employee can be a trade or business for purposes of section 166. Putoma Corp. v. Commissioner,66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979); see also Trent v. Commissioner,291 F.2d 669 (2d Cir. 1961). In determining whether a bad debt had a "proximate" relation to the taxpayer's trade or business as an employee, rather than his investment interest as a shareholder, the Supreme Court has stated that the proper measure is the dominant motivation of the taxpayer in making the loan. United States v. Generes,405 U.S. 93, 103 (1972). *411 In establishing this dominant motivation test, the Supreme Court was well aware of the differences existing between an investing shareholder and a working employee. A taxpayer's status as a shareholder is a nonbusiness interest, is capital in nature, and rests initially on tax-paid dollars; its rewards are expectative and flow, not from personal effort, but from investment earnings and appreciation. On the other hand, a taxpayer's status as an employee is a business interest and is paid in pre-tax dollars; its nature centers on personal effort and labor. United States v. Generes,405 U.S. at 100-101. To separate the shared interests of investor and employee which accompany the paying or guaranteeing of a business debt by a taxpayer who is both a shareholder and an employee and to determine this taxpayer's dominant motivation in making such a payment or guarantee, the trier of fact is to emphasize and consider objective facts, rather than subjective ones. United States v. Generes,405 U.S. at 104. Petitioners contend that their dominant motivation for personally guaranteeing Home-A-Rama's debt was to protect Robert's business income as an employee *412 of McMonagle Lumber and, thus, that any loss resulting therefrom is deductible as a business bad debt. Respondent contends that petitioners' dominant motivation was nonbusiness, that is, to protect their investment in McMonagle Lumber as shareholders rather than to protect Robert's income as an employee. We agree with respondent. The only witness in this case was Robert McMonagle. Much of his testimony, especially that going to his intent in quaranteeing the debts of Home-A-Rama, was self-serving. Additionally, Robert's statements going to his intent are subjective, rather than objective, in nature. Under the guidance of Generes, however, we are to look to objective factors, rather than to subjective ones. In examining facts of an objective nature, we first note the large investment that Robert and his wife had in McMonagle Lumber's net worth as measured by the lumber company's book value during its fiscal year ended prior to 1979, the year petitioners guaranteed the debts of Home-A-Roma. When we additionally consider the shareholder interests of petitioners' children, we find that the investment of this entire family in McMonagle Lumber's net worth approached three-quarters *413 of a million dollars during this same fiscal period of the lumber company. Such relatively large invested interests in the lumber company's net worth would suggest that, in guaranteeing the debts of Home-A-Rama, petitioners were hoping to protect and advance their family's interests and investment in the financial viability and integrity of McMonagle Lumber. See United States v. Generes,405 U.S. at 106. We note that, if Home-A-Rama were unable to obtain guaranteed financing, McMonagle Lumber would have lost its indirect sales to GBHSB. [9] Moreover, the lumber company might well have lost its direct sales to GBHGB. The guaranteeing of the debts of Home-A-Rama, which enabled the Door County company to continue its operations, served as an indirect benefit to the financial well-being of McMonagle Lumber and to petitioners' investment in the lumber company. We think it stretches credulity to believe that petitioners' dominant motive was to invest in Home-A-Rama to protect Robert's employment with McMonagle Lumber. It is obvious that Robert's employment *414 and salary compensation at McMonagle Lumber were well protected by his equity and family control in that operation. Further, notwithstanding the brother-sister relation of McMonagle and Home-A-Rama, McMonagle Lumber had only a slight direct involvement in Home-A-Rama, and certainly McMonagle Lumber was not dependent on Home-A-Rama for its income. Based on the record presented, we are not convinced that the loss of both Green Briar Homes, Inc. accounts would have either significantly reduced Robert's compensation from McMonagle Lumber based on sales or seriously compromised his and his family's investment in the lumber company. Robert was still in control and there was substantial revenue from other sources. Finally, we observe that petitioners sang practically the same song that the Supreme Court heard in Generes.Nothing Robert related was corroborated by independent documentation or testimony. The fact that no one from Green Briar Homes, Inc. or the lenders involved was called to testify leaves us to conclude that such evidence might not have been favorable to petitioners, or even may have contradicted their position. Pollack v. Commissioner,47 T.C. 92, 108 (1966), *415 affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946, affd. 162 F.2d 513 (10th Cir. 1947). As observed by the Supreme Court in Generes, the history of litigation in the business-nonbusiness bad debt area dictates "a cautious and not a free wheeling approach to the business bad debt." United States v. Generes,405 U.S. at 103. Obviously, any taxpayer concerned with this problem will endeavor to frame his case to bring it within the business bad debt aura. As all employee-shareholders who make or guarantee loans to their corporations generally act with two motivations -- to protect investment and employment, the dominant motivation of the taxpayer requires the trier to stress the objective and compare the risk to the reward. Petitioners have failed to convince us that Robert's employment or salary risk was in a league with the reward of their investment. Petitioners, having failed to carry their burden of proof, we hold for respondent. [10]
*416 We conclude that petitioners' dominant motivation for guaranteeing Home-A-Rama's debts was to protect their significant investment in McMonagle Lumber. Thus, petitioners' 1982 payments are not deductible as business bad debts under section 166. [11] These payments are instead deductible as nonbusiness bad debts. To reflect concessions and the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Respondent concedes that the proper taxable year to recognize the complete investment loss of $ 53,193.00 on petitioners' holding of sec. 1244 stock in Home-A-Rama, Inc., is 1981. Petitioners concede that they erroneously deducted a $ 149,253.00 loss in 1981, and the parties agree that any allowable loss should be reflected in petitioners' 1982 return. Because this loss amount was improperly deducted in 1981, petitioners additionally concede that the carryback to 1978 was improper. Assuming that petitioners prevail on the sole issue in this case, the net operating loss will then stem from 1982 and not 1981. A decision under Rule 155 is needed to reflect these concessions. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue. ↩
2. During the period from 1978 through 1982, the common stock of McMonagle Lumber was divided among the following individuals in the following percentages: 1978
1979
1980
1981
1982
Robert F. McMonagle and
59.74%
63.25%
53.80%
54.04%
54.04%
Rosemary McMonagle
Russell McMonagle,
6.23%
7.12%
6.17%
6.21%
6.21%
Robert's brother
Bernard Brice
7.53%
7.45%
4.75%
4.35%
-0- Children of Robert F.
26.50%
22.08%
35.28%
35.40%
39.75%
and Rosemary McMonagle
The McMonagle children had received stock in the lumber company as a way to get them involved in the corporation. ↩
3. Except for the period from 1965 to 1969 when the company lost its S-corporation status, McMonagle Lumber operated as an S-corporation from sometime in the early 1960's through 1979. ↩
4. The other shareholders of McMonagle Lumber did the same with respect to their distributive shares. ↩
5. At a later date the two divisions of Green Briar Homes, Inc. formally split. The record is unclear as to when this formal division occurred. The Sturgeon Bay operation became known as Port Side Properties, Inc. ↩
6. The sales from McMonagle Lumber to GBHGB were as follows: ↩
1979
$ 558,548
1980
421,000
1981
272,610
1982
33,085
1983
GBHGB goes bankrupt
7. This loan was guaranteed by both McMonagle Lumber Company, Inc. and petitioners. ↩
8. Sec. 166(d)(2) defines a nonbusiness debt as "a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." ↩
9. At this point, we note the sales of McMonagle Lumber to Home-A-Rama and this latter company's sales to GBHSB. ↩
10. Petitioners reliance on Halle v. Commissioner,T.C. Memo. 1983-760↩, is inapposite. In that case the corporate equivalent of McMonagle Lumber would not have had adequate revenue to compensate the taxpayer without the operation of the corporate equivalent of Home-A-Rama. We are not persuaded, and consequently conclude, that such is not the case before us. 11. Petitioners would have us make a ruling concerning their payment of Home-A-Rama's debts in years after 1982. However, these subsequent years are not properly before the Court. ↩