T.C. Memo. 2002-294


UNITED STATES TAX COURT


THOMAS K. AND BILLE J. SCALLEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2563-00.                     Filed November 27, 2002.


<u>Saul A. Bernick</u> and <u>Neal J. Shapiro</u>, for petitioners.

<u>David L. Zoss</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies of $735,745 and $38,296 in petitioner Thomas K. Scallen's Federal income taxes for 1989 and 1990, respectively.  Respondent determined deficiencies of $25,933, $75,798, and $65,669, in petitioners Thomas K. Scallen's and Bille J. Scallen's Federal income taxes

for 1992, 1994, and 1995, respectively.[1]  The parties filed a joint motion to sever the issue relating to Bille J. Scallen's joint and several liability, which we granted.  After concessions,[2] the only issue for decision is whether certain debts formerly owing to petitioner were business bad debts for purposes of section 166(a).[3]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  At the time of filing the petition, petitioners resided in Minneapolis, Minnesota.

---

[1]Petitioner Bille J. Scallen is a party to this case by reason of the fact she filed joint Federal income tax returns with Thomas K. Scallen for tax years 1992, 1994, and 1995. References to petitioner are to Thomas K. Scallen.

[2]Petitioners concede that a certain Magazine Publishing Company, Inc., debt is an S-corporation item and not a trade or business bad debt; petitioners concede that a certain Stephen Scallen debt is a nonbusiness bad debt; petitioners concede certain Schedule E income adjustments of $8,638 and $42,151 for 1994 and 1995, respectively; and the parties agree that if the Court sustains respondent's determinations, then the correct amount of petitioner's allowable itemized deduction for interest expense is $226,203 instead of $245,043 as determined in the notice of deficiency.  Respondent concedes the issue relating to his determination of unreported investment interest income of $25,000, $262,000, and $2,000 in 1990, 1991, and 1992, respectively.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the tax years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner is an experienced businessman, a producer, a radio personality, and a lawyer. Petitioner received a bachelor of arts degree (1949) and a law degree (1950) from Denver University. He worked 5 years as an assistant attorney general for the State of Minnesota, acting as a trial lawyer for the Minnesota Highway Department. He also worked for 1 year in the mid-1950s as counsel to the judiciary committee of the Minnesota State Senate. From 1956 to 1964, petitioner practiced law full time, and he thereafter practiced law part time. After 1964, petitioner spent approximately 95 percent of his time working on his own business deals and as an employee of various companies.

In 1964, petitioner became president of the Bank of Minneapolis, a downtown retail bank in Minneapolis. This bank was a small bank, and each of its officers, including petitioner, was a loan officer. Petitioner acted as a loan officer for about 4 or 5 years, and as a loan officer he evaluated creditworthiness, the character of the borrower, the cashflow of the business, the market value of the borrower's collateral, and "things like that". Petitioner was also president of the Lake City State Bank in Lake City, Minnesota.

International Broadcasting Corporation (IBC)

Petitioner incorporated International Broadcasting Corporation (IBC) in April 1981. IBC was a publicly held company, and its stock was traded on the NASDAQ national stock

exchange. IBC's corporate office was located at 5101 IDS Tower, which was also petitioner's office address.

Petitioner was a shareholder, director, and the chief executive officer of IBC from April 1981 to August 1996; he was its president from 1982 to 1995. Petitioner spent at least 80 percent of his time operating IBC. Petitioner received wages from IBC and/or its subsidiaries for each of the years 1987 to 1995.[4] Petitioner's personal financial statements report the following number of IBC shares owned by petitioner and their value:

| Date | Number of shares | Value |
|------|------------------|-------|
| 11/30/86 | 6,605,000 | $1,321,000 |
| 08/31/88 | 472,200 | 4,958,100 |
| 10/31/89 | 472,200 | 5,961,525 |
| 10/31/90 | 472,200 | 2,361,000 |
| 09/30/91 | 472,200 | 472,200 |
| 01/31/92 | 472,200 | 118,050 |
| 03/31/93 | 472,200 | 47,250 |
| 02/28/94 | 472,200 | 47,200 |

In the mid-1980s, IBC decided to go into the entertainment business, and, in 1984, it bought the CBS television affiliate, KTAB TV, in Abilene, Texas. IBC paid $9 million for KTAB TV, which was financed with a loan from Marine Midland Bank of New York. The bank required petitioner to guarantee this loan. Petitioner was to receive 1 percent or $90,000 as a guaranty fee

---

[4]Petitioner received wages of $471,805, $488,496, $419,712, $495,226, $460,385, $539,149, and $8,351, in 1987, 1988, 1989, 1990, 1991, 1992, and 1993, respectively.

from IBC for his guaranty.  IBC sold KTAB TV 2 years later for about $16 million.

On December 17, 1986, petitioner executed a guaranty agreement in favor of certain banks with respect to loans of $15 million to IBC.  The banks were represented by National Westminster Bank USA (Natwest), as agent.  The loans were made in connection with IBC's acquisitions of the Harlem Globetrotters and the Ice Capades, Inc.[5]  The guaranty agreement states that "It is in the best interests of the undersigned [i.e., petitioner] that the Borrower, which is directly owned in part by the undersigned, be able to obtain the loans provided for in the Loan Agreement".  The minutes of the special meeting of the board of directors of IBC, held on February 13, 1987, describe the circumstances of the guaranty by petitioner and authorize payment of a guaranty fee:

> The Board then held a lengthy and detailed discussion of compensation for Thomas K. Scallen, President of the Corporation.  The Board noted Mr. Scallen had personally guaranteed the Corporation's $15,000,000 obligation to National Westminster Bank, USA ("Natwest") incurred in the acquisition of The Harlem Globetrotters and Ice Capades and recognized that the duties and responsibilities had greatly increased as a direct result of these acquisitions. The importance of Mr. Scallen to the success of the Corporation has been indicated by the request for "key man insurance" by Natwest.  The directors determined

_____

[5]Petitioner coproduced and directed the Ice Capades.  He traveled with the show and was actually on the ice floor with the performers during production.  Petitioner's son, Thomas M. Scallen, operated the Harlem Globetrotters.

that his activity and direction are absolutely essential to the success of this Corporation. Upon motion duly made and seconded, Thomas K. Scallen recused himself, the following preambles and resolutions were adopted:

WHEREAS:

It is highly advantageous to this Corporation to assure the continued employment of Thomas K. Scallen as its President because of his vast business experience and expertise in corporate governance.

WHEREAS:

The President has not been compensated for his personal guaranty of the obligation to Natwest which guaranty now continues until the guaranteed obligation is satisfied, and these actions were not within the scope of his employment agreement with the Company.

NOW, THEREFORE,
BE IT RESOLVED:

That any other director of the Corporation is hereby authorized and directed on behalf of this Corporation to execute an amendment to the Schedule of Compensation attached to the Executive Employment Agreement between the Corporation and Thomas K. Scallen, dated July 11, 1983, increasing the annual salary of Thomas K. Scallen to $250,000, effective as at January 1, 1987.

FURTHER
RESOLVED:

That, in consideration of the extension of his personal guaranty as aforesaid, the reasonable value of which, in the opinion of the Board of Directors, other than Thomas K. Scallen, is at least equal to the amount of $150,000, Thomas K. Scallen is hereby entitled to receive as and for compensation for the extension of such guaranty the sum of $150,000.

> FURTHER
> RESOLVED:
>
> That any Vice President of this Company is hereby authorized and directed to execute and deliver to Thomas K. Scallen a check in the amount of $150,000 in full consideration of the extension of said guaranty upon obtaining the consent of Natwest to such payment.

At some point in or about 1988, Natwest made loans to IBC in the aggregate principal amount of $25 million. On June 1, 1988, petitioner guaranteed up to $17.5 million of those loans. The guaranty states that "It is in the best interests of the undersigned [i.e., petitioner] that the Borrower, which is directly owned in part by the undersigned, be able to obtain the loans provided for in the Loan Agreement". The board of directors for IBC determined that $175,000 was "a reasonable fee" for petitioner's guaranty and authorized the payment of that amount to petitioner.

On May 25, 1989, IBC Amusement Rides, Inc.,[6] executed a term note of $1.5 million in favor of Fantasy Rides, Inc., pursuant to a purchase agreement by and among a number of parties including IBC and Charles R. Wood, one of IBC's directors.[7] On May 26, 1989, petitioner and IBC executed a guaranty in favor of Fantasy

---

[6]IBC Amusement Rides, Inc., was a wholly owned subsidiary of IBC.

[7]The purchase agreement and note related to the acquisition of Charles R. Wood's interests in Great Escape and Fantasy Island.

Rides, Inc., with respect to the term note.  Mr. Wood required petitioner's guaranty as a condition precedent to his acceptance of the note from IBC Amusement Rides, Inc.  Petitioner reluctantly agreed to this guaranty in order to close the purchase agreement and in recognition that the acquisition transaction was in jeopardy without his guaranty.  A resolution by IBC's board of directors describes the circumstances of the guaranty and authorizes a guaranty fee be paid to petitioner:

> In May 1989, at the time the acquisition of Mr. Wood's interests in Great Escape and Fantasy Island were in the final stage of negotiation, NatWest requested that Mr. Wood's three-year promissory note be subordinated in all respects to the obligation of the Company to NatWest.  Mr. Wood, when advised of this request, declined to complete the transaction unless he received adequate security for the $1,500,000 obligation of the Company and that adequate security, in his opinion, was the personal guarantee of Thomas K. Scallen, who was reluctant to provide the guarantee.  However, in recognition that the transaction was in jeopardy, Thomas K. Scallen agreed to provide the guarantee.

> The Directors discussed possible alternative financing to the guarantee or payment to Mr. Wood in order to determine the appropriateness of fees.  Mr. Denis A Mola discussed the approach of an investment banker, including comparisons to "bridge loans" which would normally require 5 points over the life of the loan taking into consideration periodicity.  Mr. Mola further advised that to obtain such a "bridge loan" would have required the Company give a substantial equity call on the Company.  The Directors discussed the lack of security or the subordination, and the availability of potential alternatives for Mr. Thomas K. Scallen's personal guarantee; the timing of the granting of the guarantee; the reluctance of Mr. Wood to go forward with the transaction unless the guarantee was provided; the comparison to the "bridge loans" and the requirement to give up equity to provide it.  After further discussion, Mr. Lawrence Beasley moved and Mr.

George K. Hagglund seconded (Mr. Charles R. Wood and Mr. Thomas K. Scallen abstaining), the following resolutions were adopted:

> NOW, THEREFORE,
> BE IT RESOLVED:
>
> That, in consideration of the extension of his personal guaranty of the obligation of the Company to Charles Wood, the reasonable value of which, in the opinion of the Board of Directors, other than Thomas K. Scallen and Charles Wood, is at least equal to the amount of $150,000. The compensation for the extension of such guaranty in the amount of $150,000 is hereby ratified and confirmed.

In 1990, petitioner guaranteed a loan of $8.5 million from Natwest to IBC. The board of directors for IBC authorized a guaranty fee of 1 percent ($85,000) be paid to petitioner.

On February 23, 1990, petitioner executed a guaranty in favor of Natwest with respect to a $60 million loan made by Natwest and other banks to IBC. The guaranty states that "The Guarantor [i.e., petitioner] is a shareholder of the Borrower and will derive benefits, both directly and indirectly, by virtue of the loans being made to the Borrower".

IBC paid to petitioner loan guaranty fees of $150,000, $175,000, $150,000, and $85,000, in 1987, 1988, 1989, and 1990, respectively, for the various guaranties discussed above.

Western Media Group Corp. (WMG)

Western Media Group Corp. (WMG), formerly known as Ionic Controls, Inc.,[8] was incorporated in 1980.  WMG was a publicly held company, and its stock was traded in the over-the-counter market.  WMG owned a library of recordings, it was involved in oil and gas activities, and it operated an iron and steel company.  WMG's principal corporate office and records were also located at 5101 IDS Center.

Petitioner was a shareholder, officer, and director of WMG. Petitioner acquired an interest in WMG in 1981, and at all times relevant, he held 2.5 percent of its issued and outstanding shares.  Petitioner's personal financial statements report the following number of shares petitioner owned and their value:

| Date | Number of shares | Value |
|------|------------------|-------|
| 11/30/86 | 124,000 | $12,400 |
| 08/31/88 | 124,000 | 12,400 |
| 10/31/89 | 124,000 | 23,250 |
| 10/31/90 | 124,000 | 23,250 |
| 09/30/91 | 124,000 | 23,250 |
| 01/31/92 | 124,000 | 12,400 |
| 03/31/93 | 124,000 | 23,250 |
| 02/28/94 | 124,000 | 23,250 |
| 05/31/95 | 124,000 | 23,250 |

Petitioner did not receive wages or other compensation for services from WMG during 1987-95.

In 1987, WMG's oil and gas assets were nearly exhausted, and its iron and steel company commenced a bankruptcy proceeding.  In

---

[8]At the annual meeting of its shareholders on Nov. 17, 1988, Ionic Controls, Inc., changed its name to Western Media Group Corp. (WMG).

1989, WMG was contemplating a public offering to facilitate its entry into new areas of business; i.e., it was considering publishing and broadcasting (radio and television) activities. WMG decided to acquire an AM radio station, KXDC-AM, in Monterey, California, and an FM radio station, KXDC-FM, in Carmel, California, for an aggregate cost of $2.65 million. The acquisition of KXDC was proposed to petitioner by William Retzlaff, who informed petitioner that WMG required a "bridge loan" in order to purchase KXDC. Petitioner and WMG expected that any loans made by petitioner would be repaid from the proceeds of a public offering. Petitioner made a "very extensive examination" of KXDC; he had a consulting engineer; and he met with a reputable sales manager who agreed to work as general manager of KXDC. He also met with certain media people, advertisers, and radio station operators in the Monterey area to confirm the value of the property and the marketplace. He determined that the value of KXDC was $2.7 million.

To facilitate WMG's acquisition of KXDC, petitioner entered into a loan agreement with Natwest on April 19, 1989. The agreement called for a loan or loans of up to $3 million due on the earlier of April 30, 1990, or the sale of 4.5 million units of WMG in a public offering. Petitioner entered into a contemporaneous agreement with WMG in which he agreed to lend WMG up to the aggregate principal sum of $3 million. This loan

agreement extended over the same time period as the agreement with Natwest. In connection with the loan agreement, WMG executed a note in favor of petitioner.

The loan agreement between petitioner and Natwest and the loan agreement between petitioner and WMG provided for the same interest rates.[9] The loan agreement with Natwest provided that petitioner would pay Natwest a "commitment fee" as defined in the agreement[10] and a facility fee of 1 percent. The agreement with WMG, meanwhile, provided that WMG would pay petitioner a nonrefundable commitment fee of 10 percent ($300,000). WMG's obligation to petitioner was the subject of a security agreement, which petitioner perfected by filing a financing statement with the Secretary of State's office for the State of California. The security agreement provided petitioner a security interest in all the assets of WMG, including its corporate office, AM and FM transmitters, studios, and call letters. In accordance with his loan agreement with Natwest, petitioner executed an assignment

---

[9]WMG's note provided that the interest rate on the loan from petitioner to WMG was "equal to the rate set forth in the Loan Agreement payable by Scallen to National Westminster Bank USA".

[10]The loan agreement provided for a commitment fee on a quarterly basis in arrears equal to one-half of 1 percent per annum of the daily average amount of the unused loan commitment from Apr. 19, 1989, until the Natwest commitment was terminated or the "Commitment Termination Date", as defined in the agreement.

document and then assigned the WMG note and other collateral to Natwest.

In 1989, petitioner borrowed $2.65 million and $350,000, separately, under the Natwest loan agreement, which amounts he in turn lent to WMG pursuant to his loan agreement with that company. Petitioner advanced additional funds to WMG in 1989, which petitioner represents totaled $696,456.21. Petitioner made additional advances to WMG of $643,646.85, $236,450, $29,610.49 in 1990, 1991, and 1992, respectively. In 1990 and 1991, Century Park Pictures Corp. (CPPC)[11] made loans to WMG. In 1991, petitioner made payments of $223,164.44 to CPPC on the notes issued by WMG, and he treated those payments as additional advances to WMG.

WMG made payments of $124,050, $25,000, $262,000, and $2,000 to petitioner in 1989, 1990, 1991, and 1992, respectively. Those amounts were applied to reduce the principal balance then owing from WMG to petitioner. WMG accrued interest expense on its note to petitioner in 1989 and 1990. Petitioner reported the receipt of $900 interest income from WMG on Schedule B, Interest and Ordinary Dividends, of his 1989 Federal income tax return. Petitioner did not report any interest income from WMG in 1990, 1991, or 1992.

---

[11]IBC held a minority interest in Century Park Pictures Corp. (CPPC). Petitioner also owned stock in CPPC.

Following the purchase of KXDC, the business started going downhill. The sales people whom Mr. Retzlaff brought to the station were trading station time for personal items, and the station manager fell in love with a Greek fisherman and moved to Greece without telling WMG. Further, Mr. Retzlaff had represented that there was an underwriter who was going to sell WMG's stock in the public offering; however, this representation was false. WMG incurred a loss from continuing operations of $933,378 in 1989, and it had a negative net worth of $951,552. WMG incurred an additional loss of $1,054,792 in 1990. In or about this time, petitioner repaid the $3 million loan from Natwest with proceeds from the sale of another business in which he had an interest.

In early 1990, petitioner determined that WMG would not be able to repay the loan proceeds received from petitioner and that it was necessary to sell WMG's radio stations to realize their remaining value. In March 1990, petitioner and WMG agreed to rescind WMG's obligation to petitioner for the 10-percent commitment fee. The letter from petitioner to the board of directors of WMG rescinding the commitment fee agreement states:

> This confirms my offer and your acceptance to rescind, effective October 13, 1989, the agreement to pay a commitment fee of $300,000 to me in consideration of my obtaining a bridge loan and operating loan to Western Media Group Corporation at the time of acquisition of KXDC-AM & FM. I no longer am obligated to National Westminster Bank, USA (the "Bank") as change of circumstance subrogates me to the Bank's position.

Accordingly, I will be receiving interest at the contract rate during the term of the loan and the purpose for the commitment fee has been mitigated.

In addition, I agreed to extend the term of the loan to July 31, 1990 or upon the successful completion of the current public offering, whichever is first.

On January 21, 1991, an unrelated party later incorporated as the Joaquin Financial Group, Inc. (Joaquin), made an offer to purchase the KXDC-AM and KXDC-FM radio stations from WMG for $1.1 million. On July 31, 1991, WMG and Joaquin closed on the purchase. Joaquin paid WMG $239,514 cash for part of the purchase price and issued a promissory note of $860,486 for the remainder. WMG assigned the Joaquin note to petitioner in 1991. Petitioner applied the Joaquin note to reduce the principal balance which WMG owed him. Joaquin defaulted on its obligation, and on November 6, 1992, petitioner sent a notice of default to Joaquin. In 1995, petitioner received a final receivership distribution of $549,764.18 with respect to Joaquin's note.

In addition to the promissory note executed by WMG for up to $3 million, WMG executed other promissory notes in favor of petitioner:

| Date | Amount | Interest rate | Due |
|------|--------|---------------|-----|
| 04/21/89 | $200,000 | 12% | Demand |
| 04/28/89 | 20,000 | 12 | Demand |
| 05/23/89 | 20,000 | 13.5 | Demand |
| 06/09/89 | 35,000 | 13 | Demand |
| 06/19/89 | 75,000 | 13 | Demand |
| 07/07/89 | 45,000 | 13 | Demand |
| 07/11/90 | 27,000 | 11 | Demand |
| 07/19/90 | 73,000 | 11 | Demand |
| 08/15/90 | 20,000 | 11 | Demand |

Not all petitioner's loans and advances to WMG were the subject of promissory notes.

Medical Investment Corporation (Medicor)

In the early 1960s, petitioner formed a company called Medical Investment Corp. (Medicor), which was in the business of leasing medical equipment to doctors. Petitioner was the chief executive officer of this company.

Medicor bought the Olmstead County Bank located in Rochester, Minnesota. The purchase of the bank was financed with a loan from the First National Bank of St. Paul. Petitioner endorsed the note issued to First National Bank, which made him liable as a principal. Petitioner began as the senior vice president of the Olmstead County Bank, and he later became the acting executive officer and chief loan officer.

In the early 1970s, Medicor changed its corporate purpose, and it acquired the Shipstead and Johnson's Ice Follies. It also owned Northwest Sports Entertainment (Northwest) which, in turn, owned the Western Hockey League franchise of the Vancouver Canucks.[12]

In December 1970, Northwest purchased a $3 million certificate of deposit from the Bank of the South Pacific and Trust Co., Ltd. (South Pacific), a wholly owned Bahamian company

---

[12]In an annual report to the Securities and Exchange Commission, Medicor reported owning 60.1 percent of the voting securities of Northwest.

of Medicor.  South Pacific then lent $3 million to Medicor.
Medicor also received $500,000 in intercompany advances from a
subsidiary of Northwest.  On June 17, 1971, Capozzi Enterprises,
Ltd., lent $3,648,575 to Medicor so that Medicor could redeem the
certificate of deposit and repay the intercompany advances and
related expenses.  In an annual report submitted to the
Securities and Exchange Commission, Medicor reported:

> The Registrant [Medicor], by Agreement dated December
> 17, 1971, borrowed $4,000,000 Canadian funds from the
> Bank of British Columbia, Vancouver, British Columbia,
> and concurrently therewith repaid a loan made June 17,
> 1971 by Capozzi Enterprises, Ltd., Vancouver, British
> Columbia, to the Registrant in the amount of $3,127,849
> U.S. funds and $532,648 Canadian funds.  The proceeds
> of that loan (June 17, 1971) were used to repay certain
> indebtedness of the Registrant's wholly-owned
> subsidiary, the Bank of the South Pacific and Trust
> Co., Ltd., to Northwest Sports Enterprises, Ltd., * * *
> in the amount of approximately $3,000,000 and the
> repayment of additional indebtedness of the Registrant
> to Northwest in the amount of approximately $500,000.
> These debts were both guaranteed by the Registrant and
> its President, T. K. Scallen.  * * *  [Emphasis added.]

The record does not show whether petitioner guaranteed the
Capozzi loan or whether he received any fees for the guaranties
that he made with respect to the above transactions.

In 1971, petitioner lent $310,000 to Medicor.  He received
as collateral all the outstanding stock of South Pacific, which
had a value of approximately $300,000 and a subordinated position
in other investments of $77,500.

## Accounting and Tax Return Preparation

Petitioner borrowed funds to finance the loans that he made to WMG and other companies in which he held an interest. Those funds were borrowed from various credit card companies with whom petitioner had lines of credit.[13] After depositing the proceeds from those borrowings, petitioner used his personal checking account to advance funds to WMG and other entities. Petitioner made monthly payments, generally the minimum amount due, to the credit card companies. The monthly payments covered interest.

Kelly Posthumus was an accountant employed by IBC. She maintained petitioner's personal checking account records, wrote checks to pay his bills, prepared schedules of his loans to companies, and prepared yearend schedules and summaries for petitioner's tax accountants. Every time petitioner made a loan to a company, Ms. Posthumus recorded it on a schedule set aside for that particular company. Each loan was separated by date, check number, and amount on the schedule. At the end of each year, Ms. Posthumus would review petitioner's credit card and credit line statements and prepare a schedule of petitioner's interest expense for the year to give to petitioner's tax accountants. The yearend schedules and summaries were also prepared from check registers of petitioner's checking accounts.

---

[13]The credit card accounts from which petitioner obtained funds to make loans to WMG had high interest rates, perhaps as high as 20 percent.

Ms. Posthumus did not keep track of the interest rates applicable to the loans that petitioner made, and she was not personally aware whether anyone for petitioner sent periodic statements to the debtor companies that he lent money. Petitioner did not keep or maintain records reflecting the accrued interest that WMG owed him.

Petitioner hired McGladrey and Pullen, L.L.P., to do his personal and business accounting and to prepare his tax returns beginning in the 1980s through 1992. Petitioner's tax returns were prepared from the schedules prepared by Ms. Posthumus. McGladrey and Pullen also did accounting work for WMG, and it prepared amortization schedules and maintained records for the accrued interest WMG owed petitioner.

An employee of McGladrey and Pullen, James Estes, a C.P.A., assisted petitioner in his tax return preparation and planning. Petitioner met with Mr. Estes in December 1990 to discuss his income and deductions for 1990. Among the items discussed were petitioner's loans to WMG which he at that time did not anticipate as being collectible, and the impact the loans would have on his taxes. A memorandum prepared by Mr. Estes from that meeting states: "It is desired to claim a loss with respect to the uncollectible notes in 1990. In addition it is desired to claim the loss as an ordinary loss."

Petitioner's Federal income tax returns for 1987, 1988, and 1989, included a Schedule C, Profit or (Loss) From Business or Profession, for each year relating to "T Scallen Presents" described as an "entertainment" activity.[14]  On line 21 of petitioner's Form 1040, U.S. Individual Income Tax Return, for 1987, and on line 22 of his Forms 1040 for 1988 and 1989, he reported the loan guaranty fees that he received from IBC in those years as "other income".[15]  Petitioner's income tax returns for years subsequent to 1989 did not include Schedules C for the "T Scallen Presents" entertainment activity.  Instead, the returns for 1990-1995 contained a Schedule C for an unnamed business activity described as "lending/financing".[16]  On his returns for those years, petitioner did not claim deductions for any expenses relating to his receipt of loan guaranty fees from IBC or any other party.  The returns for 1990-94 each included a

---

[14]Petitioner's tax returns for 1987-92 listed his occupation as "executive".

[15]Mr. Estes, who prepared petitioner's tax returns for those years, testified that the decision to report the guaranty fee income on lines 21 or 22 "would have been made by either myself or one of the persons involved in the preparation of the return". Mr. Estes testified that this was done as a matter of convenience and that it had no affect on the calculation of petitioner's tax liability whether the items were reported on Schedules C or lines 21 or 22.

[16]Petitioner reported the guaranty fee that he received in 1990 from IBC on Schedule C, Profit or (Loss) From Business or Profession, of his Form 1040, U.S. Individual Income Tax Return, for that year.

disclosure statement that stated petitioner was engaged in a trade or business which consisted of: (1) The extension of loan guaranties in exchange for fees; and (2) making loans in anticipation of a high rate of return in the form of interest income in respect of those loans.

On the returns for 1990-93, petitioner claimed the following bad debt deductions, relating to his loans to WMG, on his Schedules C for those respective tax years:

| Tax Year | WMG |
|----------|-----|
| 1990 | $2,741,053 |
| 1991 | 437,614 |
| 1992 | 887,610 |
| 1993 | 9,112 |

In the notices of deficiency issued to petitioner(s), respondent determined that petitioner's lending and financing activities for 1990-95 did not constitute a trade or business. Respondent determined that the bad debt amounts should have been reported as nonbusiness bad debts on Schedule D, Capital Gains and Losses, of petitioner's returns for those years.[17]

---

[17]Petitioner filed Forms 1045, Application for Tentative Refund, in which he sought to carry back net operating losses from 1990, 1991, and 1992, to 1989. Each of those claimed carrybacks was disallowed by respondent in the notice of deficiency for 1989. Petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 1992 in which they claimed an additional net operating loss, and petitioner filed a Form 1040X for 1989 in which he claimed a net operating loss carryback from 1992. Respondent did not allow those claims, and he did not include them in the notices of deficiency for 1989 and 1992. Petitioner also claims that he incurred a net Schedule C loss of $260,388 for 1993 attributable to a lending/financing business

(continued...)

OPINION

Section 166(a) allows as a deduction any debt which becomes worthless within the taxable year. However, section 166(a) is not applicable to any nonbusiness debt, and, where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange of a capital asset held for not more than 1 year. Sec. 166(d)(1). A nonbusiness debt means a debt other than: (1) A debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Sec. 166(d)(2). Business bad debts generally include payments of principal or interest made by a taxpayer in discharge of part or all of his obligation under a guaranty agreement entered into in the course of a trade or business of the taxpayer. Sec. 1.166-9(a), Income Tax Regs. The burden is on the taxpayer to show his entitlement to a business bad debt deduction.[18] Rule 142(a); Litwin v. United States, 983 F.2d 997,

---

[17](...continued) and a net operating loss of $249,149 for 1993 (for which he is entitled to net operating loss carryback deductions in 1990, 1991, and/or 1992, or to net operating loss carryforward deductions for years subsequent to 1993).

[18]Petitioners do not argue the applicability of sec. 7491(a), and the record does not otherwise show whether the examination was commenced after the effective date of that Code section. We find sec. 7491(a) is not applicable to this case.

999 (10th Cir. 1993). The question whether a debt is a business or nonbusiness debt is one of fact, and it depends upon whether the debt is proximately related to a trade or business of the taxpayer. Imel v. Commissioner, 61 T.C. 318, 323 (1973); sec. 1.166-5(b)(2), Income Tax Regs.

Respondent determined that petitioner was not engaged in the trade or business of lending or financing as he claimed on his Federal income tax returns for 1990-95. Petitioner contends, on the other hand, that he has a long history of making loans and guaranties that together shows that he was involved in the trade or business of making loans and guaranties.

To be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 166(a) is applicable only to the exceptional situations in which the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business. Imel v. Commissioner, supra at 323. In determining whether the taxpayer is in the trade or business of lending money, we consider: (1) The total number of loans made; (2) the time period over which

the loans were made; (3) the adequacy and nature of the taxpayer's records; (4) whether the loan activities were kept separate and apart from the taxpayer's other activities; (5) whether the taxpayer sought out the lending business; and (6) the amount of time and effort expended in the lending activity and the relationship between the taxpayer and his debtors. United States v. Henderson, 375 F.2d 36, 41 (5th Cir. 1967); Serot v. Commissioner, T.C. Memo. 1994-532, affd. without published opinion 74 F.3d 1227 (3d Cir. 1995).

Petitioner argues that he was in the trade or business of "making loans and guaranties"; he relies on the following summary of guaranties and loans that petitioner claims he made:

#### Guaranties petitioner made

| Year | Debtor | Amount of guaranties | Guaranty fee |
|------|--------|----------------------|--------------|
| 1984 | IBC | $9,000,000 | $90,000 |
| 1987 | IBC | 15,000,000 | 150,000 |
| 1988 | IBC | 17,500,000 | 175,000 |
| 1989 | IBC Amusement Rides, Inc. | 1,500,000 | 150,000 |
| 1990 | IBC | 8,500,000 | 85,000 |
| Total | | 51,500,000 | 650,000 |

#### Loans petitioner made

| Year | Debtor | Amount of loans | Number of loans |
|------|--------|-----------------|-----------------|
| 1979-86 | IBC | $397,738 | 125 |
| 1989 | WMG | 3,000,000 | 1 |
| 1989 | WMG | [1]696,456 | 23 |
| 1990 | WMG | 643,646 | 61 |
| 1991 | WMG | 236,450 | 25 |
| 1992 | WMG | [2]10,560 | 5 |
| Total | | [3]4,989,850 | 240 |

[1]Respondent points out that this amount includes $90,843.21, which petitioner paid to Natwest in 1989, in respect of his personal obligation to Natwest.

[2]Petitioner also claims to have paid six items of WMG expense, totaling $19,050.49, in 1992.

[3]The total of the loans listed above is actually $4,984,850.

Respondent contends that petitioner's return treatment for the lending and financing activity in 1990-95 is inconsistent with his return treatment for that activity during prior tax years; therefore, evidence of the prior tax years is "irrelevant", and we should only consider those loans and guaranties which occurred in 1990-95.[19]   We disagree.

Petitioner's loans and guaranties during prior tax years are relevant in determining whether he was in the trade or business of making loans and guaranties.  We do not agree with respondent that petitioner's failure to list lending or financing as his trade or business on returns for tax years prior to 1990, or his failure to report guaranty fees on a Schedule C, forecloses petitioner's reliance on loans and guaranties that he made during those prior years.  Indeed:

> Reporting an activity on Schedule C is indicative of a trade or business.  However, petitioner's failure to so report his income from lending activities on Schedule C is not conclusive of the absence of a trade or business.  This is particularly true when as here the return was prepared by a CPA.  [Ruppel v. Commissioner, T.C. Memo. 1987-248.]

[19]Respondent argues that petitioner's failure to report the IBC guaranty fees received in 1987, 1988, and 1989, as Schedule C income from a lending and financing trade or business, was "factually inconsistent with the mandate of I.R.C. § 6011(a)."

Nevertheless, we should point out that our holding in this respect should not be read to suggest that petitioner's failure to report a trade or business on Schedule C for the prior years is irrelevant. In that regard, a taxpayer's listing of his occupation as an "executive" on his tax returns and his failure to file a Schedule C in connection with a purported trade or business are factors that indicate that the taxpayer is not in the trade or business of lending money. Estate of Bounds v. Commissioner, T.C. Memo. 1983-526. Thus, although petitioner's failure to report a trade or business on Schedule C in the prior years is not conclusive, we weigh this factor with other factors in determining whether petitioner was in the trade or business of making loans and guaranties.[20] After considering the loans and guaranties for the prior years and for the years at issue, we cannot conclude that petitioner was engaged in any such trade or business.

---

[20]Respondent also alleges that petitioner's activities prior to 1990 are irrelevant in that they "have no apparent factual nexus with his activities in the years at issue and are not probative" whether he was engaged in a trade or business in 1990. We cannot agree. Each of the activities in this case involved loans and guaranties made to, or made with respect to, a company in which petitioner held an interest. Moreover, we cannot agree that a "factual nexus" is required amongst the individual transactions that together establish a trade or business. Indeed, as petitioner points out: "The more extensive the loans, more numerous borrowers and longer time interval when loans are made, the stronger the argument for a trade or business."

Petitioner did not advertise for customers in the course of his lending and financing activities. There is no evidence of record that he held a reputation in the community as a lender or as a guarantor. As part of his lending and financing activities, petitioner lent money only to companies in which he held an interest. He guaranteed loans only with respect to those same companies. Petitioner points to no loans or guaranties involving unrelated parties or parties with whom he had no direct involvement as an investor.[21] Petitioner did not actively pursue loan or guaranty opportunities with respect to either the general public or within his community of companies. Petitioner made loans or guaranties when the need arose with respect to one of his companies. Petitioner devoted most of his time to IBC and his other activities. He has not shown that he devoted any significant time to WMG, and he was not paid for any of his services thereto. The record does show a long history (from the 1960s to the 1990s) of loans and guaranties petitioner made to companies in which he held an interest. However, that history is broken and sporadic, and it certainly is by no means continuous. See United States v. Henderson, 375 F.2d at 41.

---

[21]Lending activities confined to corporations in which the taxpayer has an interest, generally, do not give rise to a trade or business of making loans. Putoma Corp. v. Commissioner, 66 T.C. 652, 674 n.33 (1976), affd. 601 F.2d 734 (5th Cir. 1979).

Petitioner had no employees for the activity other than those employed in the IDS Tower office. He included the wages or compensation for those employees as part of his general office overhead. None of those expenses were reflected on his personal tax returns or on the Schedules C. Petitioner did not engage, on any consistent basis, in the type of formal activities that one might associate with a lending and financing trade or business. It would have been impossible to perceive his lending and financing activities as a trade or business separate from his personal or his companies' affairs.

Moreover, the testimony of Ms. Posthumus and the testimony of petitioner indicate that petitioner maintained none of the records that would show the profits actually earned or which might be expected to be earned on loans from petitioner to his companies. To that extent, respondent describes petitioner's records as "anemic", and he contends that petitioner "had no means of determining whether he was re-loaning borrowed funds at positive, or profitable, interest rate spreads or at negative, or unprofitable, interest rate spreads." Given the record before us, we agree with respondent.

Petitioner contends that the most important test in determining whether he is engaged in the trade or business of making loans and guaranties is "the extent of the activity"; i.e., the number of loans and guaranties and the respective

amounts.  Petitioner claims that "Other Courts have determined that taxpayers were in the trade or business with a volume less than shown by Thomas Scallen", citing <u>Cushman v. United States</u>, 148 F. Supp. 880 (D. Ariz. 1956) (loans totaling $88,352 over 2 years); <u>Serot v. Commissioner</u>, T.C. Memo. 1994-532 ($1,950,000 in loans over a 9-year period); <u>Ruppel v. Commissioner</u>, T.C. Memo. 1987-248 ($1,379,000 in loans over 4 years); <u>Minkoff v. Commissioner</u>, T.C. Memo. 1956-269 ($300,000 in loans over 5 years).  However, petitioner has overemphasized the role that the number of loans and, for that matter, the number of guaranties play in determining whether there exists a trade or business.  We agree that the volume of activity, e.g., lending and making guaranties, is indicative of a trade or business; however, that factor alone does not establish a trade or business.

Petitioner borrowed funds from credit card companies at high interest rates and then lent those same funds to his companies.  There is no evidence that petitioner used any of his personal funds to make these various loans, and there is no evidence that petitioner was able to obtain, or expected to obtain, any differential between the interest on loans from the credit card companies to petitioner and the interest on loans from petitioner to companies in which he had an interest.[22]  We cannot conclude

---

[22]For example, in <u>Ruppel v. Commissioner</u>, T.C. Memo. 1987-248, a case petitioner relies upon, the taxpayer borrowed money
(continued...)

that petitioner engaged in these lending transactions to earn a profit from the interest on the loans. We cannot conclude that the numerous loans over the course of years were part of any trade or business of petitioner.

With respect to IBC, petitioner claims that he made 125 separate loans or advances totaling $397,738 to IBC between 1979-1986. Petitioner testified that those loans were made whenever IBC was "short of money, and they needed help" and that he got interest on these loans. Petitioner relies on a handwritten schedule entitled "Loans from T.K. Scallen to IBC: checks written to IBC by TKS", which lists the dates of the purported loans, their amounts, and the check numbers for the loans. The record otherwise does not show the circumstances of the loans to IBC, and we have no reasonable basis for concluding whether those loans represented bona fide indebtedness, from where petitioner obtained the funds advanced to IBC, and whether petitioner expected to earn a profit from the interest on those loans.

With respect to the many advances made to WMG in 1989-92, petitioner claims that those advances should be considered loans made as part of his claimed lending and financing business.

---

[22](...continued)
to fund his lending activities at a lower interest rate than his customers, and "he could earn a profit from the interest rate he charged in excess of what he paid." Moreover, in that case, the taxpayer maintained amortization schedules containing interest rates, and the number of payments was printed and distributed to the borrowers. None of those facts are apparent herein.

However, the circumstances under which those advances were made show otherwise.

Soon after WMG purchased the AM and FM radio stations, those activities went downhill. After petitioner realized that WMG was unlikely to be capable of repaying the $3 million he lent it in 1989, he continued to advance funds to WMG to keep the company going and to protect the value of his collateral. Petitioner testified:

> Q    Now, when in 1990 did you determine that WMG was not going to be able to repay you?
>
> A    I'm not sure of the date. It was just a continuing deteriorating situation.
>
> Q    And as I understand your testimony, the funds that you continued to advance to Western Media after that point were to try and preserve what value was there in the radio station?
>
>         *    *    *    *    *    *    *
>
> A    * * *  What I was trying to say, and perhaps didn't say it very well, is that if the station goes dark and off the air, it has no value. The value is the license and the format and the continuing broadcast. And that's what I was trying to preserve.
>
> Q    I understand that. But at that point, the advances you made after you determined that the loan wasn't going to be repaid was to protect what value there was there. It was not to make interest income?
>
> A    Absolutely.

Given petitioner's testimony and the circumstances which gave rise to the advances, we cannot agree that those advances were made for the opportunity of earning high returns on interest

income as petitioner claimed in the disclosure statements attached to his returns for 1990-94. Petitioner could not have reasonably expected repayment on those advances, and any expectation of a profit would have been imaginary, especially considering the high rates of interest which attached to petitioner's borrowing of the funds advanced. The advances were made for the sole purpose of protecting petitioner's original loan of $3 million. That loan and the commitment fee do not establish a trade or business of making loans and guaranties.

The loan from Natwest to petitioner and the loan from petitioner to WMG had the same interest rates. Petitioner could not have earned, or expected to earn, a profit on that series of loans. As petitioner suggests, he was acting as a mere conduit between Natwest and WMG, because WMG was to cover all the principal, interest, and fees that petitioner might incur with respect to Natwest. Thus, in substance, the series of loans resembles a typical guaranty arrangement, and the commitment fee that petitioner was to receive from WMG resembles a typical guaranty fee. The only possible business reason we find on the record for petitioner in making this loan commitment was the opportunity of receiving the commitment fee. However, similar to petitioner's other guaranty arrangements, it appears this fee was a mere afterthought. Further, the rescission of the commitment fee that petitioner offered and which WMG accepted suggests that

this fee may have been intended only as additional security.[23]
We cannot agree that provision for this fee alone establishes a
trade or business.

In addition, the guaranties made with respect to IBC do not
establish a trade or business for petitioner.  Several, if not
all, of the guaranties were made in connection with IBC's or a
subsidiary's acquisition of another business or company.
Petitioner made those guaranties as a means of accomplishing the
acquisition and only after he was approached by the company and
informed that the deal might not go through.  The receipt of a
guaranty fee appears to be just an afterthought with respect to
those guaranties.  For example, petitioner testified with respect
to the 1984 guaranty of the IBC loan:

> Q     And why did you do the loan guarantee?
>
> A     Because it was necessary to expedite the
> transaction, and I felt that it was a good business
> proposition.  I thought the value was -- in the
> collateral was excellent.  And I charged a fee for
> doing it.

Also, with respect to IBC Amusement Rides, Inc.'s acquisition of
the Ice Capades and the Harlem Globetrotters, petitioner
testified as to why he signed a guaranty:  "Well, again, it was a
way of expediting the transaction.  It was done through a bank I

---

[23]Respondent contends that the rescission of the WMG
commitment fee shows it was "intended as additional security
rather than as an intended source of profit for petitioner."

was familiar with.  It looked like a good business opportunity to me, because I was well secured.  And I was able to make a fee."

The minutes of the board of directors of IBC and the resolutions that relate to the authorization of guaranty fees to petitioner also show a lack of business initiative, and indeed reluctance, on the part of petitioner to make the guaranties.  If anything, those minutes, the resolutions, and petitioner's testimony indicate to us that petitioner made the guaranties to protect or enhance his investment interest in IBC and not as a part of a lending or financing trade or business.

Further, it is not altogether clear that there was any agreement or understanding regarding guaranty fees in place before or contemporaneous with petitioner's making of the various guaranties.  Respondent suggests that the lack of assurance of receiving fees from IBC is inconsistent with petitioner's claim of a trade or business of making guaranties.  Respondent argues that the fees were not approved until the passing of the formal resolutions, that petitioner guaranteed debts before "his entitlement to the related guarantee fee became an approved fact", and that his guaranties "can only be construed as gratuitous acts which he intended to protect and/or benefit his then existing interests in IBC".  Petitioner testified that the board's resolutions authorizing the fees were made after he had guaranteed the various loans; however, he also testified that the

written authorization simply memorialized what the board had previously agreed to as part of informal discussions. Petitioner testified that "I certainly felt entitled to rely on that. These are honorable men on that board of directors. I had no concerns."

The minutes and resolutions, which relate to the various guaranty fees from IBC, show that there was much more going on than the informal discussions that petitioner alludes. Although it is clear that petitioner expected some fee from IBC at the time of making the guaranties, it is not clear that he was aware of the amount, if any, that he would receive. Only upon formal authorization by the board do we find any assurance of a guaranty fee being paid to petitioner. Certainly, the lack of formalism in petitioner's making the guaranties and obtaining assurance other than reliance on the "honorable men" of the board is a factor inconsistent with the existence of a trade or business.

Petitioner also relies upon the guaranties made during the 1960s and 1970s with respect to loans involving Medicor. However, the record does not show that petitioner received any fees with respect to those guaranties, and guaranties alone without the related fees would be insufficient to support a finding of a trade or business. Petitioner claims to have received a 1-percent fee on the endorsement of the note for the

1963 Medicor acquisition of the Olmstead County Bank.  He relies solely on his own testimony, which we find less than compelling:

> Q    Do you recall what fee that was, or the amount of that fee?
>
> A    I believe -- and I'm not sure.  This was a long time ago.  But I think it was 1 percent of the amount of the loan.

Petitioner also claims that he received a 1 and 3/4-percent fee on what he purports to be South Pacific's loan of $3 million to Northwest on June 17, 1971.  To support his position, petitioner cites his attorney's opening statement and an annual report submitted to the Securities and Exchange Commission.  Neither of those items supports petitioner's position.

Petitioner suggests for the first time on brief that, with respect to WMG, "If, as the Commissioner suggests, the taxpayer was trying to preserve his income as an officer of the corporation, then he is entitled to take the deductions as ordinary losses."  It is well established that a taxpayer's status as an employee is a business interest.  See United States v. Generes, 405 U.S. 93, 101 (1972); Halle v. Commissioner, T.C. Memo. 1983-760.  However, it is a fact that petitioner did not receive wages or other compensation for services from WMG during the period 1987 to 1995.  Thus, it is not plausible that petitioner made the loan to WMG with the dominant motivation of protecting any business interest as an employee in WMG, and there

is no evidence that petitioner was to receive or expected to receive any compensation as a result of the loan.

Petitioner has not shown he was engaged in the trade or business of making loans and guaranties at any relevant time in the instant case. Petitioner is not entitled to business bad debt deductions for the amounts he lent to WMG.

An appropriate order will be issued.